# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF CONNECTICUT
# BRIDGEPORT DIVISION

| | |
|---|---|
| In re: <br><br> O.W. Bunker Holding North America Inc., <br><br> Debtor. | Chapter 11 <br><br> Case No. 14-51720 (AHWS) |
| In re: <br><br> O.W. Bunker North America Inc., <br><br> Debtor. | Chapter 11 <br><br> Case No. 14-51721 (AHWS) |
| In re: <br><br> O.W. Bunker USA Inc., <br><br> Debtor. | Chapter 11 <br><br> Case No. 14-51722 (AHWS) |

**OBJECTION OF ING BANK, N.V., AS SECURITY AGENT, TO DEBTORS' MOTION FOR ENTRY OF AN ORDER UNDER 11 U.S.C. §§ 105 AND 362: (I) DIRECTING CUSTOMER PAYMENTS INTO A SEGREGATED DEBTOR IN POSSESSION ACCOUNT AND (II) AUTHORIZING AND ESTABLISHING PROCEDURES FOR RESOLUTION OF SUPPLIER LIENS AGAINST CUSTOMER VESSELS**

ING Bank, N.V. ("**ING**"), as security agent, hereby files this objection to the *Debtors' Motion for Entry of an Order Under 11 U.S.C. §§ 105 and 362: (i) Directing Customer Payments Into a Segregated Debtor in Possession Account Pending Outcome of Adversary Proceeding to Avoid Lien; and (ii) Authorizing and Establishing Procedures for Resolution of Supplier Liens Against Customer Vessels* (the "**Motion**") [Dkt. No. 17].[1]

## BACKGROUND

---

[1]  Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

1. ING is the coordinator, agent, and security agent under that certain USD700,000,000 Multicurrency Revolving Borrowing Base Facilities Agreement, dated December 19, 2013 (the "**Credit Agreement**"), and related guaranty, pledge, and security agreements, including that certain English Omnibus Security Agreement, dated December 13, 2013 (the "**Security Agreement**," and together with the Credit Agreement and all other related guaranty, pledge, and security documents, as amended, the "**Finance Documents**").

2. O.W. Bunker North America Inc. ("**OWB-NA**"), a debtor in these cases, is a borrower and guarantor of the obligations owing under the Credit Agreement. Pointedly, the Motion fails to state that OWB-NA in fact is a borrower under the Credit Agreement and, like all other borrowers under that agreement, had access to the credit provided under that facility prior to the occurrence of defaults and events of default thereunder.

3. O.W. Bunker USA Inc. ("**OWB-USA**"), also a debtor in these cases, is a guarantor of the borrowers' obligations under the Credit Agreement.

4. Each of OWB-NA and OWB-USA is also a party to the English-law governed Security Agreement, pursuant to which each has absolutely assigned all of its rights, title, and interests as of December 13, 2013, in certain customer accounts receivable arising from English-law governed supply contracts, intercompany receivables, and insurance proceeds to ING as security agent for the lenders under the Credit Agreement.

5. The third debtor in these cases, O.W. Bunker Holding North America Inc., is not a party the Finance Documents.

6. The Debtors today are not engaged in ongoing operations. Prior to the filing of these cases, the Debtors along with their international affiliates participated in a centralized cash management system where cash from customer sales is directed (based on assignments of

receivables and notices to customers given by the Debtors and their affiliates) to central accounts maintained in The Netherlands by the Debtors' parent company, O.W. Bunker A/S (a Danish corporation) that are subject to the assignments and liens granted in favor of ING and the lenders under the Finance Documents. The Debtors benefited from the liquidity provided by the lenders under that agreement to fund their operations, and those of their non-debtor affiliates around the globe.

7.      Despite the Debtors' characterization in the Motion, collections on the customer accounts receivable from customers of the O.W. Bunker group, including the Debtors, continue in accordance with the same centralized cash pooling and management systems and policies that existed for the Debtors, and their non-debtor international affiliates, since the time that the Debtors assigned their rights in certain of their customer accounts pursuant to the Security Agreement. The Debtors' parent company, O.W. Bunker A/S and certain affiliates, are debtors in bankruptcy proceedings that were commenced on November 7, 2014 before the probate court in Aalborg, Denmark (the "**Danish Bankruptcy Court**") which declared O/W Bunker A/S and certain of its Danish subsidiaries to be bankrupt and appointed trustees to oversee the wind up of their businesses. Under the supervision of the trustees appointed by the Danish Bankruptcy Court, O.W. Bunker A/S continues the ongoing collection of the assigned customer accounts receivable. Any suggestion by the Debtors that the Debtors should now extricate themselves from the corporate and capital strictures of the O.W. Bunker group, undo the assignments of customer accounts, and assume the role of collecting agent for such accounts would interfere with the established central treasury function of the O.W. Bunker group and the property rights of ING under the Finance Documents. Moreover, such a proposal would only cause further disruption to the global centralized collection efforts of O.W. Bunker A/S and its experienced

staff of collection experts. Indeed, a proposed notice to customers directing payment to the US Debtors would only add to the confusion among customers who face competing demands from suppliers and other parties in interest, thereby reducing further the likelihood that customers will make any payments without certainty that doing so will effectively discharge their obligations to the O.W. Bunker group as a whole under their contracts and applicable law.

8.      O.W. Bunker A/S cannot dispose of such cash receipts held for the benefit of all of its subsidiaries and their stakeholders without agreement of the trustees and approval of the Danish Bankruptcy Court. For the avoidance of doubt, ING is not distributing, or directing distribution of, any payments received to the lenders under the Credit Agreement until the entitlement of such lenders to receipt of any such payments is resolved by agreement among the parties or a decision of the courts of competent jurisdiction, including this Court and the Danish Bankruptcy Court.

## OBJECTION

9.      By the Motion, the Debtors seek extraordinary relief that is outside the scope of customary "first day" relief available to chapter 11 debtors. Specifically, the Debtors seek an order from this Court that would, without complying with the requirements of sections 363 and 364 of the Bankruptcy Code regarding the use of cash collateral and the required provision of adequate protection of ING's interests in the Debtors' property (and without providing other required due process to ING), divert cash collateral from the existing global cash management system (in which the Debtors participate along with their non-debtor affiliates) to an account controlled by the Debtors, which the Debtors propose to encumber with new liens in favor of suppliers that supply the Debtors with fuel oil and other goods or otherwise to use to offer assurances of payment to such vendors. At this stage of these cases, the Debtors' interest, if any,

4

in such payments is far from established and therefore the expected assurances to vendors are likely to be fleeting at best. The Debtors represent that this relief is necessary "in order to allow the Debtors [sic] business operations to restart." Motion ¶ 21. The request is extraordinary in its breadth, and more so because it is not supported by facts or law that could justify granting such relief in the circumstances of these cases, if ever. In effect, the proposed relief would sanction the unlawful use of cash collateral and elevate pre-bankruptcy unsecured claims against the Debtors to post-bankruptcy secured claims, or otherwise priority claims, without complying with the applicable strictures of the Bankruptcy Code.

10. As noted above, each of OWB-NA and OWB-USA assigned their customer accounts receivable and other property pursuant to the assignments and security in favor of ING pursuant to the Finance Documents. Any cash proceeds from the payment of such customer accounts (or on account of other collateral) would, pursuant to the Security Agreement, be held in the designated accounts under the central cash management system for the benefit of ING and the lenders under the Credit Agreement based on the prior agreements of the obligors under that agreement, including OWB-NA and OWB-USA.

11. The Debtors fail to provide adequate details in their Motion that would justify their proposal to collect payments made on account of accounts receivables directly from customers or provide the basis for their attempt to opt out of the existing corporate and capital structure of the O.W. Bunker group and its centralized cash pooling and management system that operates on a uniform and global basis. Indeed, in the *Declaration of Adrian Tolson, General Manager of OWB-NA, In Support of Chapter 11 Petitions and First-Day Pleadings*, dated November 13, 2014 (the "**Tolson Declaration**") [Dkt. No. 15], which was filed with the chapter 11 petitions commencing these cases, the Debtors acknowledge the uncertainty surrounding their

5

entitlement, if any, to receive customer payments from customers. Tolson Declaration ¶¶ 45-49 (explaining the Debtors' reliance on intercompany payments from its corporate parent, O.W. Bunker A/S, to satisfy creditor claims, and its intercompany sales to O.W. Panama to generate revenue for the O.W. Bunker group as a whole).

12. The proposed relief would also adversely affect the interests of ING by elevating the rights and claims of the Debtors against their non-debtor affiliates. The Debtors' entitlement to payments, if any, from O.W. Bunker A/S remains uncertain and will be resolved in due course through the administration of the proceedings affecting O.W. Bunker A/S before the Danish Bankruptcy Court. Indeed, it would appear that many of the customer receivables are the result of oil purchases funded by the Debtors' parent, O.W. Bunker A/S. Allowing the Debtors to side-step the centralized collection of customer receipts, which if retained by the Debtors would result in a windfall for the Debtors without the obligation to reimburse O.W. Bunker A/S the cost of purchasing the fuel that provided the basis for the sale in the first instance. The Court should not permit this attempt by the Debtors to short-circuit the rights of ING against the Debtors and their non-debtor affiliates, and certainly not under the guise of an "first day" motion.

13. To the extent that any cash proceeds held by O.W. Bunker A/S are "cash collateral", as defined in section 363(a) of the Bankruptcy Code, the Debtors cannot use or encumber such cash collateral without ING's consent or authorization from the Court after providing ING with adequate protection of its interests in such cash collateral. *See* 11 U.S.C. § 363(e); *see also In re Waste Conversion Techs.*, 205 B.R. 1004, 1007 (D. Conn. 1997) ("Because a secured creditor is deprived of its secured interest in a debtor-in-possession's collateral when that debtor seeks to use this collateral to maintain an on-going business, the adequate protection afforded by the bankruptcy court must be 'completely compensatory.'") (quoting *In re Murel*

*Holding Corp.*, 75 F.2d 941, 942 (2d Cir. N.Y. 1935); *In re South Side House, LLC*, 474 B.R. 391, 408 (Bankr. E.D.N.Y. 2012) (holding debtor must demonstrate secured creditor is adequately protected to use cash collateral); *In re Goode*, 235 B.R. 584, 590 (Bankr. E.D. Tex 1999) (holding that a debtor's need for funds is not a substitute for the need to provide adequate protection to a secured party's interests).

14. On information and belief, there are also serious doubts regarding the propriety of these cases continuing under chapter 11 (or without the appointment of a trustee). It appears that in all likely scenarios, the Debtors cannot "restart" their operations and at best will achieve nothing more than a liquidation of their remaining assets with all proceeds paid to creditors holding allowed claims. There is no reasonable prospect of a reorganization and, indeed, these cases may be more appropriately resolved under chapter 7 of the Bankruptcy Code.

15. For the reasons stated in the Tolson Declaration, the Debtors and their non-debtor affiliates have become engulfed by allegations of fraud and significant trading losses (amounting to approximately $300 million to date). On November 6, 2014, in a press release to investors, the O.W. Bunker group announced that, based on these surprising and unfortunate events, it is "assumed that the group's equity is lost". *See* Press Release, O.W. Bunker, Commencement of In-Court Restructuring Procedure in Two Subsidiaries (Nov. 6, 2014) (annexed hereto as <u>Exhibit A</u>). This shocking result follows the group's $1 billion initial public offering—completed just six months ago. Tolson Declaration ¶¶ 14-15. Following these dramatic events, the Debtors' lenders for good reason terminated available credit lines, thereby cutting off O.W. Bunker A/S's ability to fund operations on the customary basis. *Id.* As discussed above, O.W. Bunker A/S and two of its Danish subsidiaries, O.W. Bunker & Trading A/S and O.W. Supply & Trading A/S, commenced insolvency proceedings in Denmark on November 6, 2014 and have been declared

bankrupt by the Danish Bankruptcy Court. *Id.* ¶ 16. Two of the Debtors' affiliates in Singapore are also subject to recent liquidation proceedings following in the wake of the fraud and trading scandals. The Debtors are therefore in a liquidity crisis of their own making and, in the midst of such crisis, continued to accept delivery of fuel shipments and other goods from vendors for sale to customers.

16. Given the devastating effects of these fraud and trading losses on the Debtors' business, there are serious doubts regarding the Debtors' ability to provide adequate protection, or any protection, of ING's interests in its collateral. The Debtors make no effort in their Motion to explain the basis on which they could achieve this or the terms on which they would propose to use cash collateral to "restart" their business. While there may be scenarios where with time and capital the Debtors can salvage some business from the remains of the North American operations of the O.W. Bunker group, in the circumstances ING and the lenders under the Credit Agreement cannot be forced to be co-investors in whatever future venture the Debtors may ultimately propose.

17. Furthermore, the Motion is extraordinary inasmuch as it would permit the Debtors to grant new liens on ING's cash collateral in favor of other creditors of the Debtors without further order of this Court and without a determination by the Court that such creditors are entitled to post-bankruptcy liens to secure their pre-bankruptcy claims. Motion ¶ 16. The Supplier Lien Procedures would permit the Debtors to obtain credit from their suppliers by providing <u>senior</u> or <u>pari passu</u> liens on account of unsecured pre-bankruptcy claims over cash collateral at the expense of ING and other creditors and without ING's consent. The Debtors suggest that the mere hope of collecting any existing receivables from customers should warrant this extraordinary relief for vendors who may have no basis to assert secured or priority claims

against the Debtors, something that must be determined through further proceedings. In any event, to obtain such extraordinary relief with respect to ING's security, the Debtors must meet the requirements of sections 361 and 364 of the Bankruptcy Code. Further, the relief sought by the Debtors is typically granted only after an interim and final hearing, which process stands in in stark contrast to the Debtors' proposal to obtain such relief under an *ex parte* "first day" motion.

18. Section 364 of the Bankruptcy Code governs the Debtors' ability to obtain new credit. Here, the Debtors are proposing relief to secure or provide priority treatment to holders of pre-bankruptcy claims against the Debtors. Section 364(b) of the Bankruptcy Code requires a notice and hearing before the debtor can obtain unsecured debt outside the ordinary course with priority treatment under section 503 of the Bankruptcy Code. Similarly, section 364(c) of the Bankruptcy Code requires notice and a hearing to authorize the debtor to incur debt on a super-priority basis or with liens on unencumbered property of the Debtors or junior liens. Pursuant to section 364(d) of the Bankruptcy Code, the Court may only authorize the Debtors to "prime" ING's security interests if, after notice and a hearing, the Court first determines that the Debtors have carried their burden of demonstrating that (i) the Debtors have no other way of obtaining the required credit and (ii) ING's interests will receive adequate protection. 11 U.S.C. 364(d). *In re Seth Co.*, 281 B.R. 150, 153 (Bankr. D. Conn. 2002) ("[t]he ability to prime an existing lien is extraordinary") (quoting COLLIER ON BANKRUPTCY ¶ 364.05 (15th Ed. Revised 2002)). The Debtors make no effort to satisfy the stringent requirements of section 364(d) of the Bankruptcy Code and they should not be permitted to simply ignore the critical protections afforded to ING by that section. For the reasons stated in the Tolson Declaration, the Debtors cannot meet these burdens.

19. ING holds liens over certain customer accounts and other property of the Debtors. The Debtors have merely alleged that such liens may be subject to avoidance under section 547 and 550 of the Bankruptcy Code. Mere allegations however are not sufficient to defeat ING's liens to deny ING the protections afforded to it under sections 363 and 364 of the Bankruptcy Code, along with the required procedural protections of the adversarial process, regardless of the exigencies. *See, e.g., In re McMahon*, 70 B.R. 290, 295 (Bankr. N.D.N.Y. 1987) ("A preferential transfer as that herein is a voidable, not a void, transaction."); *Federal Deposit Ins. Corp. v. Davis*, 733 F.2d 1083, 1084 (4th Cir. 1984) ("Preferences under § 547, however, are voidable, not void. Consequently, the trustee must take affirmative steps in the bankruptcy to set aside a preferential transfer.") (internal citations omitted). In order to challenge the priority of ING's liens, the Debtors must commence an adversary proceeding governed by Part VII of the Bankruptcy Rules. Fed. R. Bankr. P. 7001 (providing that an "adversary proceeding" includes "a proceeding to determine the validity, priority, or extent of a lien or other interest in property . . . ."); *see also In re C.M.R. Assoc., Inc.*, No. 90-00590, 1992 Bankr. LEXIS 435 at *4 (Bankr. D. Vt. Mar. 25, 1992) ("The preference issue involves an attempt 'to recover money or property,' and thus falls within Fed.R.Bkrtcy.P. 7001(1)."). As the Third Circuit Court of Appeals has observed, where Bankruptcy Rule 7001 "require[s] an adversary proceeding—which entails a fundamentally different, and heightened, level of procedural protections—to resolve a particular issue, a creditor has a due process right to not have that issue resolved without one." *In re Mansaray-Ruffin*, 530 F.3d 230, 242 (3d Cir. 2008).

20. The relief requested in the Motion cannot be granted under applicable law and, not surprisingly, the Motion does not cite authority that would warrant the Court granting such extraordinary relief in the circumstances, and certainly not on an *ex parte* basis in the first few

days of the Debtors' cases. Despite the Debtors' allegations, ING is entitled to the important due process protections afforded by Part VII of the Bankruptcy Rules and the Debtors' cannot be permitted to ignore ING's rights and defenses to such allegations, apart from the host of factual issues that must be established through discovery before any determination can be made on the merits. Meanwhile, all of ING's rights, claims, causes of action, counterclaims, arguments, and remedies are reserved.

21.     Faced with a dearth of authority to support the specific relief they are seeking in the Motion, the Debtors urge the Court to grant the Motion on the basis of the broad equitable authority vested in it by section 105(a) of the Bankruptcy Code. However, it is well-settled that section 105(a) of the Bankruptcy Code "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity. . . . [A]an exercise of section 105 power must be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective." *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 91-92 (2d Cir. 2003). Far from being tied to another Bankruptcy Code section, the relief sought by the Debtors can only be granted if this Court disregards the protections afforded to ING by sections 363 and 364 of the Bankruptcy Code and the Bankruptcy Rules governing adversary proceedings and the use of its cash collateral. The Court's authority under section 105(a) of the Bankruptcy Code does not extend so far.

## CONCLUSION

WHEREFORE, for the foregoing reasons ING respectfully requests that the Court deny the Motion and grant such other and further relief as the Court deems just and proper.

Dated: November 18, 2014
Bridgeport, Connecticut

        **ZEISLER & ZEISLER, P.C.**

        /s/ Craig I. Lifland
        Craig I. Lifland (ct00976)
        10 Middle Street
        Bridgeport, CT 06604
        (203) 368-4234 (telephone)
        (203) 367-9678 (facsimile)
        clifland@zeislaw.com

        -and-

        **ALLEN & OVERY LLP**

        Daniel J. Guyder (*pro hac vice* pending)
        John Kibler (*pro hac vice* pending)
        1221 Avenue of the Americas
        New York, NY 10020
        (212) 610-6300 (telephone)
        (212) 610-6399 (facsimile)
        daniel.guyder@allenovery.com
        john.kibler@allenovery.com

        *Attorneys for ING Bank, N.V., as Security Agent*

# EXHIBIT A

06.11.2014 07:28:57 CET

# OW Bunker - Commencement of in-court restructuring procedure in two subsidiaries

COMPANY ANNOUNCEMENT
6 November 2014
No. 26/2014

### COMMENCEMENT OF IN-COURT RESTRUCTURING PROCEDURE IN TWO SUBSIDIARIES

Following the announcement on November 5, 2014 (company announcement 25/2014) regarding fraud in Singapore and significant risk management loss, the board of directors regrets that it has not been able to find a solution with the syndicate banks. On this basis, it has been decided to file for commencement of in-court restructuring procedure in the subsidiaries O.W. Bunker & Trading A/S and O.W. Supply & Trading A/S at the probate court in Aalborg. The main operational activities of the group are located in these companies, which are expected to be insolvent.

The purpose of the in-court restructuring procedure is to establish an overview of whether a basis for continued operations of the companies can be established, including a basis for injecting further capital or other similar solution.

For the time being, the financial impact cannot be assessed, however, it must be assumed that the group's equity is lost.

In court restructuring procedure is aimed at debtors who are insolvent but where there is a chance that all or part of the debtor's business may be able to continue operations after the completion of a restructuring. The procedure is intended to provide a tool for management and creditors alike, offering the possibility of rescuing an insolvent business, and thereby preserving its assets, rather than proceeding straight to the filing of a bankruptcy petition.

For further information, please contact:
Niels Henrik Jensen, Chairman of the Board of Directors, tel.: +45 20 23 21 88
Jim Pedersen, CEO OW Bunker, tel.: +45 98 12 72 77

*This announcement contains forward-looking statements. Any forward-looking statements involve known and unknown risks, uncertainties and other important factors that could cause our actual results, performance, achievements or industry results, to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Should one or more of these risks or uncertainties materialise, or should any underlying assumptions prove to be incorrect, our actual financial condition, cash flows or results of operations could differ materially from what is described herein as anticipated, believed, estimated or expected.*

*In the event of any discrepancy between the Danish and the English version of this announcement, the English version shall prevail.*

**About OW Bunker**
Read more on www.owbunker.com

~ OW Bunker - Commencement of in-court restructuring procedure