## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| O.W. Bunker Holding North America, Inc., *et al.*[1] | ) | Case No. 14-51720 (AHWS) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |

### AMENDED MOTION FOR ORDER (A) DECLARING THAT THE AUTOMATIC STAY DOES NOT APPLY TO INTERPLEADER ACTIONS (B) OR, IN THE ALTERNATIVE, MODIFYING THE AUTOMATIC STAY

Clearlake Shipping Pte Ltd. ("**Clearlake**") , by and through its counsel, Cohen and Wolf, P.C. and Holland & Knight LLP, hereby moves (the "**Motion**")[2] this Court, pursuant to sections 105(a) and 362(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for an Order declaring that the automatic stay does not apply to interpleader actions filed by Clearlake against the Debtors and various third-parties in the United States District Court for the Southern District of New York (the "**Interpleader Actions**") or, in the alternative, modifying the automatic stay to permit the United States District Court for the Southern District of New York (the "**SDNY**") to proceed with the Interpleader Actions.  In support thereof, Clearlake respectfully states:

### THE PARTIES

1.     Clearlake is a foreign corporation organized and existing under the laws of Singapore, with an office and place of business at 12 Marina Boulevard, #35-02 Marina Bay Financial Tower 3, Singapore 018982.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' taxpayer identification numbers, are as follows: O.W. Bunker Holding North America Inc. (7474), O.W. Bunker North America Inc. (7158) and O.W. Bunker USA Inc. (3556).

[2] This Amended Motion amends Clearlake's Motion for Order (A) Declaring that the Automatic Stay Does Not Apply to Interpleader Action (B) Or, In The Alternative, Modifying The Automatic Stay dated December 12, 2014 (Doc 173) which is scheduled for hearing on January 6, 2014, pursuant to the Notice of Hearing dated December 16, 2014 (Doc 183) in this case.

2.      O.W. Bunker USA Inc. ("**OW USA**") is a corporation or business entity organized and existing pursuant to the laws of Texas, with an office and place of business at 2603 Augusta Drive, Suite 440, Houston, TX 77057.

3.      O.W. Bunker North America Inc. ("**OW North America**") is a corporation or business entity organized and existing pursuant to the laws of Connecticut, with an office and place of business at 281 Tresser Blvd., 2 Stamford Plaza, 15th Floor, Stamford, CT 06901.

4.      O.W. Bunker Holding North America Inc. ("**OW Holding**") is a corporation or business entity organized and existing pursuant to the laws of Connecticut, with an office and place of business at 281 Tresser Blvd., 2 Stamford Plaza, 15th Floor, Stamford, CT 06901.

5.      OW USA, OW North America and OW Holding are collectively referred to as "**Debtors**."

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicate for relief requested herein is 11 U.S.C. §§ 105 and 362 as well as Bankruptcy Rule 4001(a).

## BACKGROUND

**I.      Bunker Supply to Vessels Venus Glory and Hellas Glory**

9.      On or about October 14, 2014, Clearlake ordered fuel (known as "bunkers") to be loaded onboard and consumed by the vessel Venus Glory from O.W. Bunker (Switzerland) SA ("**OW Switzerland**").  The bunkers were to be supplied to the Venus Glory in Houston, Texas. According to OW Switzerland's Sales Order Confirmation for this transaction, which is attached as **Exhibit A** hereto, the "supplier" is identified as "NuStar."

10.     OW Switzerland is apparently a corporate affiliate of the Debtors, and all together are hereinafter referred to collectively as the "**OWB Entities**".

11.     An invoice, a copy of which is annexed as **Exhibit B** hereto, was issued to Clearlake on October 20, 2014 by OW Switzerland for the supply of bunkers to Venus Glory. The invoice directs payment of $327,637.29 to OW Switzerland.

12.     On or about October 14, 2014, Clearlake ordered fuel bunkers to be loaded onboard and consumed by the vessel Hellas Glory from OW Switzerland.  The bunkers were to be supplied to the Hellas Glory in Houston, Texas.  According to the Sales Order Confirmation issued by OW Switzerland for this transaction (a copy of which is annexed as **Exhibit C** hereto), the "supplier" is identified as "NuStar."   The bunkers were delivered to Hellas Glory on October 26, 2014.

13.     An invoice was issued to Clearlake on October 20, 2014 by OW Switzerland for the supply of bunkers to Hellas Glory.  The invoice (a copy of which is annexed as **Exhibit D** hereto) directs payment of $980,959.81 to OW Switzerland.

14.     The standard terms and conditions of all OWB Entities for the sale of bunkers includes clause P.5: "Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim aris[ing] in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York."  A copy of the OWB Entities' terms is attached hereto as **Exhibit E**.

15.     On or about November 11, 2014, Clearlake received an e-mail from NuStar Energy Services, Inc. ("**Nustar**").  A copy of the e-mail is attached hereto as **Exhibit F**.  In the e-mail, NuStar states that it "sold fuel to OW Bunker USA as the agent for the vessels Venus

Glory and Hellas Glory….OW Bunker USA Inc. is in financial distress and it has advised us that it will not pay the [NuStar] invoice.  We therefore ask that vessel interests immediately pay the invoice directly to NuStar….If we do not receive payment promptly, we may have no choice but to assert a maritime lien against the vessel."  On November 13, 2014, by e-mail (Exhibit F) NuStar forwarded to Clearlake copies of the sales agreements and invoices between NuStar and OW USA pertaining to Venus Glory and Hellas Glory.  (Copies of those documents are attached hereto as **Exhibit G**).

16.    On or about November 13, 2014, the Debtors all filed voluntary petitions pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut as Case Nos. 14-51720, 14-51721 and 14-51722.  The three bankruptcy cases were subsequently consolidated for administrative purposes only under Case No. 14-51720.

17.    ING Bank N.V. ("**ING**") has indicated that it is secured lender for the Debtors and their affiliates pursuant to a certain Omnibus Security Agreement dated December 19, 2013 between O.W. Bunker & Trading A/S and its subsidiaries (believed to include OW Switzerland, OW USA, OW North America and OW Holding), and ING, as Security Agent.  ING has indicated that the OWB Entities have  assigned certain of their rights in respect of their bunker supply contracts as security to ING.

18.    Under the circumstances, Clearlake could not and cannot ascertain whether the amount owed should be paid to OW Switzerland, NuStar or ING (or any other party) in order to extinguish all maritime liens against Venus Glory and Hellas Glory *in rem* and to prevent their arrest in the SDNY or in any District Court where those vessels may call or elsewhere as well as precluding any *in personam* actions against Clearlake.

19.    Under United States maritime law, it is undisputed that the contract supplier of necessaries (such as OW Switzerland), including fuel bunkers, to a vessel can assert a maritime

lien against that vessel.  Additionally, under certain circumstances, a physical supplier of the fuel

(such as NuStar) may also assert a maritime lien on that vessel.  Moreover, other parties, such as

ING, may be expected to assert a right to the bunker payments.

20.     Even more concerning, at the time this situation was developing, Venus Glory

and Hellas Glory were due to call at various ports in the United States and thus could face arrest

pursuant to Fed. R. Civ. P. Supplemental Admiralty Rule C by any party alleging to hold a

maritime lien, which would cause significant harm to Clearlake, delay Venus Glory and Hellas

Glory, adversely affect innocent third parties with interests in those vessels' cargo and generally

inhibit maritime commerce.

21.     In order to resolve this urgent matter, and to prevent the arrest of one or both of

the vessels Venus Gory and/or Hellas Glory, on November 21, 2014, Clearlake filed a Complaint

for Interpleader pursuant to 28 U.S.C. §§ 1333, 1335(a), 2361 and Fed. R. Civ. P. 9(h)  ("**Venus**

**Glory Interpleader Action**"), against OW Switzerland, the Debtors, NuStar and ING in the

SDNY to resolve competing claims to amounts owed pursuant to invoices for the sale and

delivery of bunker fuel to the two vessels.[3]

22.     As set forth in its Interpleader Complaint attached hereto as **Exhibit H** (submitted

herewith without its exhibits, since the exhibits are included here as Exhibits A through G),

Clearlake was and is faced with uncertainty as to the proper recipient of funds owed pursuant to

the supply of the bunkers.  Clearlake expressly noted in the Venus Glory Interpleader Action that

the action was not in violation of the automatic stay imposed by the U.S. Bankruptcy Code, 11

U.S.C. § 362.  (*Id.* at n. 1).

23.     Also on November 21, 2014, Clearlake filed an *ex parte* Motion in the Venus

Glory Interpleader Action to deposit funds in an amount equal to the amounts of the OW

---

[3] *Clearlake Shipping Pte Ltd v. O.W. Bunker (Switzerland) SA, et al.*, U.S.D.C., S.D.N.Y., No. 14-cv-9287 (VEC).

Switzerland invoices ($1,308,597.10) in the registry for the SDNY.  Attached as **Exhibit I** is a

copy of the Order of the SDNY (the Honorable William H. Pauley, III), dated that same day,

granting Clearlake's Deposit Motion (the "**Venus  Glory Deposit Order**") and accepting

Clearlake's funds into its Registry.

24.     At the same time, Clearlake filed an *ex parte* Motion in the Venus Glory

Interpleader Action, pursuant to 28 U.S.C. § 2361 of the Federal Interpleader Act, restraining all

claimants to the deposited funds  from instituting or prosecuting any proceeding in connection

with the transactions related to the supply of the bunkers to the Venus Glory and Hellas Glory,

and restraining all claimants from arresting the Venus Glory and/or Hellas Glory pursuant to

Supplemental Admiralty Rule C.  Attached as **Exhibit J** is a copy of the Order of the SDNY,

dated November 21, 2014, granting Clearlake's Motion for a Restraining Order (the "**Venus**

**Glory Restraining Order**").

25.     The following Monday, November 24, 2014, NuStar's counsel submitted a letter

to Judge Pauley.  NuStar's letter advised the Court that prior to receiving notice of the Venus

Glory Restraining Order, NuStar had filed an *in rem* action in Houston, Texas, against the vessel

Venus Glory.  NuStar also noted that this vessel was due to arrive in Houston on Wednesday,

November 26, 2014.  NuStar sought a conference in order "to address how its *in rem* rights

against the vessel and/or the interpleaded funds can be adequately protected."  Attached as

**Exhibit K** is a copy of the NuStar letter filed on ECF.

26.     In reply to the NuStar letter, Clearlake's counsel submitted a letter to the SDNY

asserting that it was not necessary to arrest a vessel in order to create a substitute *res* for it.

However, in order to address any concern the SDNY might have had on the issue, Clearlake

proposed an amendment to the Venus Glory Restraining Order.  Attached as **Exhibit L** is a copy

of the Clearlake letter filed on ECF.

27.     In response to NuStar's request, the SDNY ordered a telephonic hearing for 3:30 p.m. on Tuesday, November 25, 2014.  In addition to counsel for Clearlake and NuStar, counsel for the Debtors and ING were on the telephone for the conference.

28.     It was only at the conference that counsel for ING and NuStar raised the issue of the automatic stay before Judge Pauley.  Other than Clearlake's counsel's reference to the citation in the footnote in the Venus Glory Interpleader Complaint, there was no citation to authority by NuStar's or ING's counsel but simply statements on the call that the automatic stay was of concern or did apply.

29.     During the conference, Judge Pauley observed that indeed the matter was "ideal" for an interpleader.  However, Judge Pauley then said that he was concerned that there was a serious issue that the matter may be subject to the automatic stay.  As such, he decided "as a matter of caution" that the Venus Glory Restraining Order and the Venus Glory Deposit Order would be dissolved and he also would order the Clerk of the SDNY to return the deposited funds to Clearlake.  The resulting order was entered later that day.  A copy of the Order is attached hereto as **Exhibit M**.[4]

30.     To summarize the situation: late on Tuesday, November 25, 2014, Judge Pauley (the then-assigned Judge in the SDNY) was faced with a challenging decision: an issue (the automatic stay) was raised in a telephonic hearing in the context of a vessel's imminent arrival in Houston (shortly before Thanksgiving).  There was no briefing of the issue nor even citation to authority by those who raised the issue.  Judge Pauley adopted a cautionary approach and dissolved the Venus Glory Restraining Order, citing concerns that to allow the order to be

---

[4] At the hearing, Judge Pauley also observed that the various interpleader cases involving the various OWB Entities presented a compelling need for consolidation and thus directed that Clearlake's counsel bring the situation to the attention of the Court's Chief Judge.  The next day, Clearlake's counsel submitted a letter to Chief Judge Preska of the SDNY about the interpleader matters.  As a result of the letter, on December 1, 2014, Chief Judge Preska ordered that the relevant cases, including the matters herein, be transferred to the Honorable Valerie E. Caproni.  A copy of the letter, including Chief Judge Preska's endorsement thereon, is attached hereto as **Exhibit N**.

maintained might be a violation of the automatic stay in the Chapter 11 bankruptcy pending in this Court by three of the defendant-claimants in the Venus Glory Interpleader Action.[5]

31.    The following day, November 26, 2014, Clearlake and NuStar reached an agreement on security, which prevented the arrest of the vessel Venus Glory in Houston.  A copy of the Security Agreement is attached hereto as **Exhibit O**.  As may be noted in the Security Agreement, if the Motion herein is successful, the funds now escrowed will be re-deposited in the Venus Glory Interpleader Action.

## II.    Bunker Supply to Vessel Ernest N

32.    On or about October 22, 2014, Clearlake ordered bunkers to be loaded onboard and consumed by the vessel Ernest N (together with the vessels Venus Glory and Hellas Glory, the "**Vessels**") from OW Switzerland.  The bunkers were supplied to Ernest N within the Port of Long Beach, California.  A copy of the Sales Order Confirmation is annexed as **Exhibit P**.  On this document the "supplier" is listed as "OW".

33.    The bunkers were delivered to Ernest N on November 5, 2014.  A bunker delivery receipt was issued by OW North America.  A copy of the bunker delivery receipt is annexed hereto as **Exhibit Q**.

34.    The bunker delivery receipt notes that the bunkers were delivered by the bunkering barge, David Fanning.

35.    According to the barge's description documents, the barge is operated by Westoil Marine Services, Inc. ("**Westoil**") .  A copy of the barge's description (known as its "Q88") is annexed hereto as **Exhibit R**.

---

[5] As set out here, Judge Pauley had little time to consider the automatic stay issue.  On the other hand, Judge Caproni, who is now the assigned Judge for all the OWB Entities interpleader matters has had the opportunity to consider the issue in detail.  In *MT Cape Bird Tankschiffahrts GMBH & Co. KG v. O.W. USA Inc., et al.*, U.S.D.C., S.D.N.Y., No. 14-cv-9646 (VEC), after consideration of the briefing on whether the automatic stay applied to the issuance of a similar restraining order against, *inter alia*,  OW USA and OW North America, Judge Caproni reached the conclusion that the automatic stay did not apply and issued the restraining order.  (ECF Docs. Nos. 6 and 8).

36.    Based on the pricing listed on the Sales Order Confirmation and the quantity of bunkers delivered as reflected in the bunker delivery receipt, Clearlake, upon information and belief, owes payment of $455,756.30.

37.    Concerning the standard terms and conditions of all OWB Entities for the sale of bunkers including here to Ernest N, Clearlake refers to ¶ 14 above and Exhibit E.

38.    Due to the bankruptcy filings of the Defendants OW USA, OW North America and OW Holding as addressed in ¶¶ 16-20 above, it is possible that Westoil Marine or ING (or some other third party including OW North America) will seek to collect amounts allegedly owed to them arising from or related to the supply of bunkers to the Ernest N.

39.    In order to resolve this urgent matter, and to prevent the arrest of Ernest N, on November 21, 2014, Clearlake filed a Complaint for Interpleader pursuant to 28 U.S.C. §§ 1333, 1335(a), 2361 and Fed. R. Civ. P. 9(h)   ("**Ernest N Interpleader Action**"), against OW Switzerland, the Debtors, Westoil and ING in the SDNY to resolve competing claims to amounts owed for the sale and delivery of bunker fuel to the Ernest N.[6]

40.    As set forth in the Ernest N Interpleader Complaint attached hereto as **Exhibit S** (submitted herewith without its exhibits, since the exhibits are included here as Exhibits E and P through R), Clearlake was and is faced with uncertainty as to the proper recipient of funds owed pursuant to the supply of the bunkers.  Clearlake expressly noted in the Ernest N Interpleader Complaint that its action was not in violation of the automatic stay imposed by the U.S. Bankruptcy Code, 11 U.S.C. § 362.  (*Id*. at n. 1).

41.    Also on November 21, 2014, Clearlake filed an *ex parte* Motion in the Ernest N Interpleader Action to deposit funds in an amount equal to the value of the bunkers supplied to Ernest N ($455,756.30) in the registry for the SDNY.  Attached as **Exhibit T** is a copy of the

---

[6] *Clearlake Shipping Pte Ltd v. O.W. Bunker (Switzerland) SA, et al.*, U.S.D.C., S.D.N.Y., No. 14-cv-9286 (VEC).

Order of the SDNY (the Honorable P. Kevin Castel, sitting as Part I judge) of such date granting Clearlake's Deposit Motion (the "**Ernest N Deposit Order**") and accepting Clearlake's funds into its Registry.

42.    At the same time, Clearlake filed an *ex parte* Motion in the Ernest N Interpleader Action, pursuant to 28 U.S.C. § 2361 of the Federal Interpleader Act, restraining all claimants to the funds in the registry from instituting or prosecuting any proceeding in connection with the transactions related to those funds, and restraining all claimants from arresting Ernest N pursuant to Supplemental Admiralty Rule C.   Attached as **Exhibit U** is a copy of the Order of the SDNY, dated November 21, 2014, granting Clearlake's Motion for a Restraining Order (the "**Ernest N Restraining Order**").

43.    No further action specific to the Ernest N Interpleader Complaint has taken place since then.

44.    Under the circumstances, in order to address Judge Pauley's concern in the Venus Glory Interpleader Action as well as to confirm the validity of the Ernest N Interpleader Action, Clearlake seeks entry of an Order, pursuant to Sections 105(a) and 362(d)(1) of the Bankruptcy Code, declaring that the automatic stay pursuant to 11 U.S.C. § 362(a) does not apply to the Interpleader Actions or, in the alternative, modifying the automatic stay to permit the SDNY to proceed with the Interpleader Actions.

**BASIS FOR RELIEF**

I.    **Interpleader Actions involving a Debtor do not Violate the Automatic Stay**

45.    The automatic stay does not apply to the Interpleader Actions.

46.    Federal Courts within the Second Circuit routinely have held that the automatic stay under § 362 of the Bankruptcy Code does not apply to non-bankruptcy interpleader actions

where a bankrupt debtor is a nominal defendant (*i.e.*, not a defendant in the true sense but rather a mere claimant to the funds deposited).

47.     The leading case for this principle is *Price & Pierce Int'l, Inc. v. Spicers Int'l Paper Sales, Inc.*, 50 B.R. 25 (S.D.N.Y. 1985):

> The automatic stay provision normally applies to actions in which the bankrupt is a defendant.  Although [debtor] is a named defendant, its status in that regard is nominal.  In making a claim to the Fund, [debtor] takes the role of plaintiff in this action.  Thus, this is not an action to obtain possession of property held by [debtor], as required for the invocation of § 362; rather, it is an action to determine whether the Fund, or some part thereof, rightfully belongs to [a third party] or [debtor].

*Id.*, 50 B.R. at 26.

48.     The Second Circuit has positively cited *Price & Pierce* as an example of the practical limits of the automatic stay imposed in bankruptcy cases.  *In re Prudential Lines Inc.*, 928 F.2d 565, 573 (2d Cir. 1991).

49.     Additionally, there are other examples of courts within the Second Circuit issuing decisions consistent with the holding of *Price & Pierce*.  *In re Enron Corp.*, 306 B.R. 465, 471 n. 3 (Bankr. S.D.N.Y. 2004) (distinguishing between application of automatic stay to declaratory judgment actions and  an interpleader action as discussed in *Price & Pierce*); *Commercial Union Ins. Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 31 B.R. 965, 970 (S.D.N.Y.1983) (distinguishing interpleader actions and affirming bankruptcy court's conclusion that automatic stay applied to pending declaratory judgment action).

50.     Since § 362 of the Bankruptcy Code mandates a stay only of litigation "against the debtor" designed to seize or exercise control over the property of the debtor, it does not prevent entities against whom the debtor proceeds in an offensive posture from protecting their legal rights through non-bankruptcy litigation.  *See In re Berry Estates, Inc.*, 812 F.2d 67, 71 (2d Cir. 1987) (automatic stay provision applicable only to actions against the bankrupt or to seizures

of property of the bankrupt); *In re Financial News Network Inc.,* 158 B.R. 570, 573 (S.D.N.Y.

1993).

51.    Under these circumstances, the automatic stay does not apply to the Interpleader

Actions because the Debtors are merely nominal defendants (*i.e.*, possibly claimants to all or part

of the funds) in the Interpleader Actions and the funds proposed to be re-deposited (see Exhibit

O) or on deposit with the SDNY do not constitute property of the estates of any of the Debtors.

52.    In the admiralty context, actions to foreclose on and adjudicate maritime liens on

property which does not belong to the debtor but which may have an effect on the debtor have

been held to not violate the automatic stay.  In *In re Chugach Forest Products, Inc.*, 23 F.3d 241

(9th Cir. 1994), the arrest of a vessel pursuant to Admiralty Rule C with debtor's property on

board "did not threaten to dismember the bankruptcy estate or impede the reorganization

proceedings… the foreclosure merely delayed [debtor's] expected receipt of cash from the sale

of its [cargo].  Such incidental effect is insufficient to trigger the stay." *Id.* at 245.

53.    Similarly, in *In re Riffe Petroleum Co.*, 601 F.2d 1385 (10th Cir. 1979), the

seizure of a ship on charter to the debtor to enforce a maritime lien against the vessel did not

violate the automatic stay because the ship was not the property of the debtor at the time the

bankruptcy petition was filed.  "Congress did not give the bankruptcy court exclusive jurisdiction

over all controversies that in some way affect the debtor's estate.  The fact that a debtor's

property may be affected by proceedings under admiralty law does not constitute a 'claim'

against that 'property.' *Id.* at 1390 (internal citations omitted).

54.    In the Interpleader Actions, the funds to be re-deposited or deposited into the

registry of the SDNY are not the property of the Debtors, and the competing maritime lien

claims and other potential claims against the funds must be adjudicated.  Even if the admiralty

proceeding affects the Debtors by delaying the collection of funds (if any) they may be owed, the

proceeding is outside the scope of the automatic stay, which seeks to protect property in a

debtor's possession at the time of filing the bankruptcy petition.

55.     The parties with a colorable claim to the funds at issue are as follows: (a) OW

Switzerland, in connection with the invoices and sales order confirmations issued to Clearlake;

(b) ING, in connection with ING's alleged security interest in the assets of OW Switzerland, the

Debtors and their affiliates; (c) Debtors, to the extent they assert any claim in the Venus

Glory/Hellas Glory matter as an intermediary and as a physical supplier in the Ernest N matter;

(d) as to Venus Glory and Hellas Glory: NuStar, in connection with the emails to Clearlake

demanding payment for the bunkers supplied; and, (e) as to Ernest N:  Westoil in connection

with barging services provided in that transaction.

56.     Clearlake is not seeking to collect on a claim against any of the Debtors, nor is it

attempting to seize property of the Debtors.  Rather, Clearlake willfully deposited funds with the

SDNY so that the SDNY can properly determine the proper owner or owners of those  funds.  In

no way can Clearlake's actions be characterized as "offensive" against the Debtors or their

property.  In this way, the Debtors' status as defendants in the Interpleader Actions are nominal

in nature.

57.     Accordingly, the automatic stay under 11 U.S.C. § 362 does not apply to the

Interpleader Actions and the SDNY's determination of the proper owner or owners of the funds

related to the bunker transactions.

**II.     The District Court, not the Bankruptcy Court, can Decide Maritime Lien Issues**

58.     The Interpleader Actions are maritime actions brought pursuant to 28 U.S.C.

§ 1333 and Fed. R. Civ. P. 9(h), with supplemental jurisdiction under 28 U.S.C. § 1335.

59.     A District Court is the only court under Article III of the Constitution with

original jurisdiction over maritime actions.  *See, e.g., Romero v. International Terminal*

*Operating Co.*, 358 U.S. 354, 360-61 (1959).  Pursuant to Article III, Congress may not

"withdraw from [Article III] judicial cognizance any matter which, from its nature, is the subject

of a suit at the common law, or in equity, or in admiralty."  *Murray's Lessee v. Hoboken Land &*

*Improvement Co.*, 59 U.S. (18 How.) 272 (1856); *Northern Pipeline Construction Co. v.*

*Marathon Pipeline Co.*, 458 U.S. 50 (1982); s*ee also Stern v. Marshall*, 131 S.Ct. 2594

(2011)(bankruptcy court could not enter final judgment on state law claim).

60.     Courts in the Southern District of New York and elsewhere in the Second Circuit

have discussed the effect the *Stern* case has had on the power of bankruptcy courts.  *See, e.g*., *In*

*re Lyondell Chemical Co.*, 467 B.R. 712, 719 (S.D.N.Y. 2012) ("Under *Stern*, it is not the

core/non-core distinction but Article III that determines the bankruptcy court's adjudicative

authority") (finding that final orders can only be made by the non-Article III bankruptcy court on

consent of all the parties).

61.     Simply put, because the SDNY is the only court with authority to determine the *in*

*rem* maritime claims at issue in the Interpleader Actions and can maintain personal jurisdiction

over OW Switzerland and all of the other applicable and necessary parties, that court is the only

appropriate forum for resolution of the competing claims concerning the funds related to the

bunker transactions.

## III.    Courts Other than Bankruptcy Court Have Jurisdiction to Adjudicate Debtors' Affirmative Claims

62.     Throughout the interpleader and similar proceedings surrounding these

bankruptcy cases, counsel for the Debtors, ING  and the Official Committee of Unsecured

Creditors (the "Committee") have questioned the ability of a court other than this Court to

"discharge" the obligations of a third party that may owe an obligations to one or more of the

Debtors.   Clearlake submits that the use of the term "discharge" is incorrect under these

14

circumstances, and note that it is clear, based on bankruptcy law and related statutes, that a court

other than this Court has the authority to adjudicate a claim by a debtor in possession against a

third party that may owe money to the debtor's estate, including the authority and jurisdiction to

find in favor of or against that third party, provided that such other court has jurisdiction over the

third party.

63.     Section 1107(a) of the Bankruptcy Code provides that, with certain exceptions not

applicable here, a debtor in possession has all of the rights and duties of a trustee appointed

under and in accordance with the Bankruptcy Code.  This would include the right under Section

323 of the Bankruptcy Code to "sue and be sued" on behalf of the bankruptcy estate.

64.     While many claims against third parties can and are brought in the bankruptcy

court that is hearing the case, claims by the debtor in possession against third parties can and are

frequently brought in state and federal courts other than the bankruptcy court, especially where

the bankruptcy court cannot obtain personal jurisdiction over a third party that owes obligations

and/or money to the debtor.   In fact, as illustrated in *Stern v. Marshall*, 131 S. Ct. 2594 (2011),

many different types of claims held by the debtor in possession are required to be brought in a

court other than the bankruptcy court due to lack of jurisdiction in the bankruptcy court over

such claims (which is the case in these matters).

65.     As any such court has the authority and jurisdiction to adjudicate such claims, it

necessarily must be able to reach a decision and enter a judgment against or in favor of the third

party that owes the obligation to the debtor.   Under these circumstances, the issuance and entry

of a judgment against or in favor of such third party (including the outcome of any appeal), and

the satisfaction of any such judgment, would act to satisfy the third party's obligations as to the

debtor, without the need for any bankruptcy court consideration or approval.

66.    Accordingly, it is incorrect to say that a court of proper jurisdiction other than the bankruptcy court cannot enter a judgment that would prevent any further claims against the third party, effectively "discharging" the third party from any further liability to the debtor.  Such courts can and do exercise such power and authority.

**IV.    In the Alternative, If the Automatic Stay Applies, Modification of the Automatic Stay for Cause under Section 362(d)(1) of the Bankruptcy Code is Warranted**

67.    Section 362(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . (1) for cause, including the lack of adequate protection of any interest in property of such party in interest . . ." 11 U.S.C. § 362(d)(1).

68.    Courts in the Second Circuit consider the following twelve factors that may be relevant in deciding whether the stay should be lifted for cause, in order to permit litigation to proceed in another forum:

(1) whether relief would result in a partial or complete resolution of the issues;

(2) lack of any connection with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(5) whether the debtor's insurer has assumed full responsibility for defending it;

(6) whether the action primarily involves third parties;

(7) whether litigation in another forum would prejudice the interests of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether movant's success in the other proceeding would result in a judicial lien

avoidable by the debtor;

(10) the interests of judicial economy and the expeditious and economical resolution of

litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) impact of the stay on the parties and the balance of harms.

*In re Sonnax Indus.*, 907 F.2d 1280, 1286 (2d Cir. 1990). These factors are often referred to as

the "Sonnax Factors."

69.     The Sonnax Factors, to the extent they apply, are used "in deciding whether

litigation should be permitted to continue in another forum, though . . . [n]ot every one of these

factors will be relevant in every case." *Schneiderman v. Bogdanovich (In re Bogdanovich)*, 292

F.3d 104, 110 (2d Cir. 2002) (quoting *Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 143 (2d

Cir. 1999)). "In deciding whether to lift a stay to allow a creditor to continue litigation in another

forum, a bankruptcy court should consider the particular circumstances of the case and 'ascertain

what is just to the claimants, the debtor and the estate.'" *In re Touloumis*, 170 B.R. 825, 828

(Bankr. S.D.N.Y. 1994); *see also In re Keene Corp.*, 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994).

70.     An analysis of the applicable Sonnax Factors here weighs heavily towards

modification of the Automatic Stay to permit the SDNY to proceed with the Interpleader

Actions.[7]

71.     Sonnax Factor 1 supports modification of the automatic stay.  The SDNY will be

able to enter a final determination of the competing claims to the funds among the Debtors and

various third parties.  Modification of the stay will permit the parties to avoid complex

---

[7] Sonnax Factors 3, 5, 8, 9 and 11 are inapplicable here.

jurisdictional issues which may cast a determination of this Court in doubt (see *Stern v. Marshall* discussion above).

72.    Sonnax Factor 2 supports modification of the stay because the Interpleader Actions and the relevant issues should not interfere with the Debtors' bankruptcy cases and allowing the Interpleader Actions to proceed will in fact assist this Court in administering the bankruptcy case and the estates of the Debtors, as the SDNY is the proper venue to resolve many of the issues that this Court cannot resolve, as discussed herein.

73.    As to Sonnax Factor 4, while the SDNY is not a specialized tribunal, it is worth noting that the terms and conditions for the sale of bunkers by all OWB Entities establishes the SDNY as the proper venue to resolve all disputes in connection with bunker sales. *See* Exhibit E. Furthermore, as noted above, the maritime lien issues cannot be decided by a Bankruptcy Court, but can and must be decided by the SDNY, which has the authority and jurisdiction to decide all issues related to these matters.

74.    Sonnax Factor 6 applies here because the Interpleader Actions involve disputes among the Debtors and several necessary third parties as to the proper owner or owners of the funds. As noted above, this Court is not the most appropriate forum for ING, NuStar, Westoil and OW Switzerland to litigate this matter.

75.    Sonnax Factor 7 supports modification of the automatic stay. No creditor will be prejudiced by proceeding with the Interpleader Actions in the SDNY. In fact, creditors may be benefitted from the action. For example, if the SDNY determines that ING is the proper owner of all or part of the funds, this may decrease ING's claim against the Debtors and their affiliates to the benefit of Debtors' other creditors.

76.    The interests of judicial economy and the expeditious resolution of the disputed issues under Sonnax Factor 10 strongly favor modification of the automatic stay. If

18

determination of the proper owner of the funds was to occur in this Court by way of adversary proceedings, the parties would first need to engage in inefficient litigation as to whether this Court has constitutional authority to finally determine this issue.  In *Stern v. Marshall*, the Supreme Court held that a Bankruptcy Court does not have constitutional authority to finally determine a debtor's pre-petition counterclaims that do not arise out of the claims allowance process, similar to the claims asserted in the Interpleader Actions.  *See* 131 S. Ct. 2594, 2615-17 (2011).  Rather than forcing the parties to the Interpleader Actions to litigate jurisdictional issues in this Court (which would deplete funds of the Debtors' estate by forcing Debtors' counsel to brief this issue), the more efficient manner forward is for these disputes to be litigated in the SDNY.

77.     Sonnax Factor 12 supports modification of the automatic stay because Clearlake will be greatly prejudiced if the Interpleader Actions are not permitted to move forward in the SDNY.  Supplemental Admiralty Rule C permits the holder of a maritime lien to arrest a ship. So in addition to the typical concern in interpleader cases – the threat of duplicative liability – Clearlake is also faced here with the threat of seizure of the Vessels, which would cause substantial harm to its own (and others') business interests.  The SDNY's rescission of the Venus Glory Restraining Order has left Clearlake subject to the potential arrest of the Venus Glory and Hellas Glory at the hands of claimants other than NuStar.  On the other hand, there is no prejudice to the named defendants in the Interpleader Actions.  All OWB Entities (including Debtors, pursuant to the OW Bunker terms set out in Exhibit E) have willfully chosen the SDNY as their venue of choice for such interpleader actions.  In additional, resolution of this matter by the SDNY may benefit the Debtors by possibly reducing the claim of ING.

78.     Accordingly, the Sonnax Factors support modification of the automatic stay to permit the SDNY to proceed with the Interpleader Actions even if the automatic stay is applicable.

79.     Notice of this Motion has been given to (i) counsel for the Debtors (via counsel); (ii) the Office of the United States Trustee; (iii) the Official Committee of Unsecured Creditors in these cases (via counsel); and (iv) other parties by operation of the Court's electronic filing system.

80.     In accordance with Federal Rule of Bankruptcy Procedure 4001(a)(3), Clearlake requests that the Order granting this Motion be effective immediately so that Clearlake may protect the Vessels from arrest and seizure and proceed with the Interpleader Actions pending in the SDNY.

WHEREFORE, Clearlake respectfully requests the Court to enter an Order (a) declaring that the automatic stay pursuant to Section 362 of the Bankruptcy Code does not apply to the Interpleader Actions; (b) in the alternative to subsection (a), modifying the automatic stay pursuant to § 362(d) of the Bankruptcy Code in order to permit the SDNY to proceed with the Interpleader Actions; and (c) granting any other relief as this Court deems just and proper.


Dated:  December 23, 2014                    Respectfully submitted,

                                             CLEARLAKE SHIPPING PTE LTD.

                              By:  /s/ David B. Zabel
                                   David B. Zabel, Esq. (ct 01382)
                                   COHEN AND WOLF, P.C.
                                   1115 Broad Street
                                   Bridgeport, Connecticut  06604
                                   Tele:  (203) 368-0211
                                   Fax:   (203) 337-5555
                                   E-mail: dzabel@cohenandwolf.com


                              Of Counsel (*pro hac vice*):

                                   James H. Hohenstein, Esq.
                                   E-mail: jim.hohenstein@hklaw.com
                                   Arthur E. Rosenberg, Esq.
                                   E-mail: arthur.rosenberg@hklaw.com
                                   Holland & Knight LLP
                                   31 West 52nd Street
                                   New York, NY 10019
                                   Tele:  (212) 513-3200
                                   Fax:   (212) 385-9010

#34218471_v8