**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION**

| | |
|---|---|
| In re: <br><br> O.W. BUNKER HOLDING NORTH AMERICA, INC. *et al.*,[1] <br><br> Debtors. | ) Chapter 11 <br> ) <br> ) Case No. 14-51720 (AHWS) <br> ) <br> ) Jointly Administered <br> ) <br> ) December 30, 2014 <br> ) |

**JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS TO ENFORCE ORDER APPROVING THE SALE OF
VOPAK OIL AND RELATED ASSETS AND FOR SANCTIONS**

O.W. Bunker Holding North America Inc., O.W. Bunker North America Inc., and O.W. Bunker USA Inc., debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), jointly with the Official Committee of Unsecured Creditors of the Debtors appointed in the Chapter 11 Cases (the "Committee," and collectively with the Debtors, the "Movants"), by and through their undersigned counsel, hereby move for an order enforcing this Court's *Order Pursuant to Bankruptcy Code Sections 105(a), 363, 365, and 503, Federal Rules of Bankruptcy Procedure 2002, 6004, 6006, and 9014, and Local Rule of Bankruptcy Procedure 6004-1 (I) Approving the Sale of the Debtors' Vopak Oil and Related Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (II) Authorizing the Assumption and Assignment of the Vopak Terminal Contract; and (III) Granting Certain Related and Facilitative Relief* (the "Sale Order") entered December 8, 2014 [DE 147] and awarding appropriate sanctions against Aegean Bunkering (USA), LLC ("Aegean") in the

---

[1] The last four digits of the Debtors' taxpayer identification numbers follow in parentheses: O.W. Bunker Holding North America Inc. (7474); O.W. Bunker North America Inc. (7158); O.W. Bunker USA Inc. (3556). The Debtors' address is 281 Tresser Blvd., 2 Stamford Plaza, 15th Floor, Stamford, CT 06901.

form of the costs and expenses incurred by the Movants in preparing, filing, and prosecuting this Motion. In support of this Motion,[2] the Movants respectfully state as follows:

## SUMMARY OF ARGUMENT

1. The Movants seek immediate enforcement of a Court-approved asset sale under § 363 of title 11 of the United States Code (the "Bankruptcy Code"). Shortly after the initiation of the Chapter 11 Cases, the Debtors sought the Court's authority to conduct an auction sale of all of their fuel oil stored at the Vopak Terminal in Los Angeles.

2. Aegean submitted a binding offer for all of the fuel oil at issue at a specific price per metric ton of each relevant grade of fuel oil.

3. Despite initial questions as to whether Aegean was bidding on the total volume of the auctioned fuel oil or the pre-auction estimates, the Debtors' representative requested that Aegean clarify on the auction record (for which the Movants have a transcript) that the per-metric ton prices in its binding bid would apply to the actual tonnage that would be delivered, whether that tonnage was greater or less than the amounts estimated: "And to the extent that the actual tonnage is different, you are sticking by the per ton price, correct?" *See* Transcript of December 4 auction, Exhibit B hereto, p. 29, l. 16-18. Aegean responded affirmatively: "The unit price." *See id.* at p. 29, l. 19. The Debtors representative replied: "Perfect." *See id.*, p. 29, l. 20.

4. Aegean was the winning bidder, and entered into a binding agreement with the Debtors for the purchase of the fuel oil at the Vopak Terminal at specific per-metric ton prices for each relevant grade of fuel oil, as it had bid at the auction. The Court entered the Sale Order approving this agreement, directing the parties to cooperate toward consummation of the

---

[2] The Movants reserve the right to supplement this Motion prior to any hearing on this Motion.

2

agreement, and retaining jurisdiction to adjudicate any disputes. The parties recognized that there would be a "true-up" of the final purchase price at the specific per-metric ton price in Aegean's winning bid, once the precise amount of the oil to be delivered was determined.

5. At the initial closing, based on the estimated amount of fuel oil, Aegean paid the Debtors $11,013,080.00. It turned out that there was more oil at the terminal than estimated (one of the known scenarios), which at the per-metric ton prices agreed by Aegean requires payment of an additional $885,000. But Aegean refused to purchase the additional oil unless the Debtors permitted it to pay the then-market price (which was lower than the per-metric ton price bid approved at the auction and by this Court).

6. Aegean's only proffered legal "excuse" for its contention that the excess oil should be given to it at a substantial discount from its approved bid is an alleged off-the-record discussion with a representative of the Debtors during the auction that completely contradicts the on-the-record discussions and clarification cited above. Aegean claims that during this off-the-record discussion, the Debtors' financial advisor agreed that the unit price of any excess would be subject to further negotiation. Even if this discussion took place (and the Debtors categorically deny such a conversation took place), it is also completely contradicted and foreclosed by the written purchase agreement approved by the Court, which merges all discussions into the written agreements and disclaims all oral representations (consistent with the parol evidence rule). Importantly, Aegean never sought to qualify the confirming language cited previously by putting any modification on the record.

7. Now that the quantity of the Vopak Oil has been determined to exceed the original estimates – a possibility well-known to Aegean and all other bidders – Aegean refuses to

close on its agreement to purchase all of the Vopak Oil at its final bid price, citing the purported oral agreement with the Debtors at the auction.

8. Aegean has every incentive to stall, and little to lose by waiting for resolution of this Motion (unless the Court also awards the requested sanctions), because while it delays closing the fuel oil market may move toward its position and beyond, allowing it to profit. If the market increases above Aegean's bid price there may be no legal authority to compel Aegean to pay the higher amount. So Aegean is playing the stall game and has forced the Movants to bring this Motion.

9. The plain terms of the Sale Order and related documents unambiguously provide that Aegean will buy all of the fuel oil at the Vopak Terminal, even amounts in excess of earlier quantity estimates, at the prices indicated in Aegean's winning bid. Aegean has no justification for refusing to close as agreed. The final purchase order expressly integrates the relevant written agreements and disclaimed any reliance on oral representations and warranties. Therefore, the purported oral agreement with the Debtors at the auction is, at best, irrelevant and, more likely, a fabricated delaying tactic.

10. The Movants seek sanctions from Aegean for their fees and costs relating to this Motion so that the Debtors' estates and creditors do not bear the burden of Aegean's unjustified refusal to comply with the Sale Order. Aegean's excuse for non-performance – the oral side deal with the Debtors – is factually unsupportable and legally frivolous, and is a pretext meant to aid Aegean in buying time in order to escape a losing speculative bet. The Debtors' estates and creditors should not bear the cost of the Movants filing and prosecuting this Motion to force Aegean to live up to its Court-approved contractual obligations.

11. Finally, as further grounds for sanctions, if Aegean responds to this Motion with its frivolous legal argument about an alleged oral agreement set forth in calls and emails with counsel to the Movants, then the Court may enforce the terms of Rule 11 of the Federal Rules of Civil Procedure, as made applicable herein by Rule 9011 of the Federal Rules of Bankruptcy Procedure.

## JURISDICTION

12. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. 157(b)(2) because the Movants seek to enforce the terms of the Sale Order. *See* 28 U.S.C. § 157(b)(2); *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 23-31 (2d Cir. 2002); *Russian Media Group, LLC v. Echostar Comm. Corp.*, 2009 WL 4036849, *5 (D. Conn. Nov. 19, 2009). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND FACTS

13. On November 13, 2014 (the "Petition Date"), each of the Debtors filed in this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

14. Prior to the Petition Date, the Debtors purchased marine fuel, oil and related goods on credit from suppliers for sale to third party ship-owners and operators. *See* Declaration of Adrian Tolson (the "Tolson Declaration") [DE 15] at ¶¶ 12-15. The collapse of the Debtors' parent companies and resulting withdrawal of trade credit "resulted in a severe liquidity crisis for the Debtors." *See* Tolson Declaration at ¶ 15.

15. As a result of the Debtors' liquidity crisis, the Debtors were left unable to sell fuel oil stored at the Vopak Terminal in Los Angeles (and nearby) to customers in the ordinary course of their businesses. *See Debtors' Motion for Orders: (I)(A) Authorizing and*

5

*Establishing Sale Procedures Relating to the Sale of the Vopak Oil and Related Assets, (B) Approving Certain Notice Procedures, and (C) Scheduling a Hearing to Consider the Proposed Sale; and (II) Authorizing and Approving the Sale of the Vopak Oil and, if an Assignment is Sought, Assumption and Assignment of the Vopak Lease and Granting Certain Related and Facilitative Relief* (the "Sale Motion") [DE 49] at ¶ 7-8, 44.

16. Accordingly, on November 18, 2014, the Debtors filed the Sale Motion. By the Sale Motion, the Debtors sought the Court's approval of procedures for the sale of "substantially all of the Debtors' oil stored at Vopak Terminal Los Angeles, Inc. … and nearby and related assets" (the "Vopak Oil"). *See id.*

17. In the Sale Motion, the Debtors estimated that there were "[m]ore than 27,000 metric tons of various grades of oil" included in the Vopak Oil. *See id.* at ¶ 7. However, the Debtors made it clear throughout the sale process that this was an approximate figure and that the Debtors could not provide an exact volume for the Vopak Oil prior to bidding. All of the bidders for the Vopak Oil, including Aegean, were well aware that the volume figures used for the Vopak Oil were estimates, and the actual quantity to be purchased would need to be fixed by an independent "true up" measurement prior to closing.

18. The Debtors sought an expedited auction sale of all of the Vopak Oil to secure operating funds for the Debtors before further declines in the market value of the Vopak Oil. *See id.* at ¶¶ 10, 16, 19, 44, 58. "[The Vopak Oil] is a commodity that is subject to significant price volatility, for which the Debtors have no hedges or other protection. Thus, the Debtors are fully exposed to substantial price volatility (in an apparently declining market), which could cost the Debtors hundreds of thousands or millions of dollars." *Id.* at ¶ 10.

19.  The Debtors' suspicions regarding market volatility are supported by publicly-available data regarding the price of various grades of fuel oil at Los Angeles ports. Screen captures of average monthly prices since August 2014 for various grades of fuel oil at Los Angeles (available from Bunkerworld, http://www.bunkerworld.com/prices/port/us/lax/) are attached hereto as <u>Exhibit A</u>.[3]  According to Bunkerworld's data, prices of all grades of fuel oil have declined since October 2014, and prices of some grades – including RMG 380, which makes up the bulk of the Vopak Oil – have been in decline since September 2014.  As of November 14, 2014, the average price of RMG 380 at Los Angeles was $451.00 per metric ton. *See* Exh. A at 1.

20.  Aegean chose to take the price volatility of the Vopak Oil as an opportunity for speculation.  Aegean may have bid on the Vopak Oil in early December in the hope that fuel oil prices had bottomed out, and would climb in the period between bidding, Court approval, and closing on the Vopak Oil.  If the price of fuel oil moved in Aegean's favor, it could buy all of the Vopak Oil at its final bid price and re-sell at a higher price.  As we have seen, prices moved against Aegean; so Aegean is delaying closing where is has nothing further to lose (except potential sanctions) and everything to gain if prices turn its way.

21.  On November 24, 2014, the Court entered an *Order (I) Establishing Sale Procedures Relating to the Sale of the Vopak Oil and Related Assets; (II) Approving Certain Notice Procedures; (III) Scheduling a Hearing to Consider the Proposed Sale and (IV) Granting Certain Related Relief* (the "<u>Sale Procedures Order</u>") [DE 79].  The Sale Procedures Order provided the terms for an auction of the Vopak Oil.  These terms allowed bidders to specify in

---

[3] Bunkerworld is a trade publication in the marine fuels market.

7

their bids that that they were purchasing a particular quantity of the Vopak Oil.  Aegean never utilized this option, bidding instead on all of the Vopak Oil.

22.    On December 4, 2014, in accordance with the Sale Procedures Order, the Debtors held an auction by telephone at which Aegean prevailed in its bid to purchase all of the Vopak Oil.  *See Notice of Auction Results and Filing of Proposed Sale Order* [DE 133] at 1.  A copy of the transcript of the auction is attached hereto as Exhibit B.

23.    At the auction, the Debtor's representative specifically requested that Aegean confirm it was bidding a per-metric ton price that would apply even if the quantity of the Vopak Oil changed after exact measurement:

> And we want to understand, as you go through, if you are saying that the -- we just want to make sure, given the different values that you have ascribed to each quantity of fuel, that we don't get in a situation of delivery of more or less that the price is going to change.  So let's go through what the prices we should assume for each metric ton of each of the four types of fuel how your 10,971,080 [bid] breaks out.

*See id.*, p. 28, l. 8-16. (emphasis added).  After Aegean went through the per-metric ton prices it had bid for the entirety of the various grades of fuel oil at estimated volumes, the Debtors' representative requested further clarification that these per-metric ton prices applied to the actual tonnage that would be delivered, not just the estimates: "And to the extent that the actual tonnage is different, you are sticking by the per ton price, correct?"  *See id.*, p. 29, l. 16-18.  Aegean responded affirmatively: "The unit price."  *See id.* at p. 29, l. 19.  The Debtors representative replied: "Perfect."  *See id.*, p. 29, l. 20.

24.    The Debtors made it clear to Aegean on the record at the auction that they did not believe the per-metric ton prices being offered by Aegean could change if the actual volume of the Vopak Oil to be delivered varied from the Debtor's estimates, one way or the other.

8

25. On December 4, 2014, Aegean executed a Bid Pursuant to 11 U.S.C. § 363 (the "Purchase Order") evidencing the terms of its binding, irrevocable final bid for the Vopak Oil under the Sale Procedures Order. A copy of the Purchase Order is attached to the Sale Order as Exhibit I.

26. Aegean now claims in calls and correspondence with Movants' counsel that there was an oral agreement with a representative of the Debtors that the fuel oil in excess of the auction volume estimates could be purchased at a rate to be negotiated later. First, the Debtors vehemently deny the existence of this oral side agreement, and Aegean never chose to place this purported oral side agreement on the auction record to further clarify the language cited previously. Second, and importantly, the Purchase Order does not include any mention of the purported side deal between Aegean and the Debtors at the auction. In fact, the express terms of the Purchase Order provide that Aegean agrees to purchase all of the Vopak Oil at its specified per-metric ton bid price, with the exact volume to be determined by an inspection after Court approval of the Purchase Order. Specifically, by the Purchase Order, Aegean agreed to purchase all of the "Product" – defined in the Purchase Order as "[a]ll available Products as offered per bid amount below, actual tons purchased based on tank gauge measurement." *See* Purchase Order, Exh. I to Sale Order at 2. Section 4 of the Purchase Order provides that "[t]he Buyer's bid shall be denominated in United States Dollars per metric ton for all volume contained in the tank at Vopak Terminal." *See id.* Section 4 of the Purchase Order further provides a per-metric ton price to be paid by Aegean for each of the relevant grades of the Vopak Oil (collectively the "Final Bid Prices") and indicates "estimated tonnage" amounts for calculation of an estimated total purchase price – presumably for consideration of the Court in evaluating approval of the Purchase Order under § 363. *See id.* Finally, section 7 of the

9

Purchase Order provides that the final quantity of the Vopak Oil to be purchased by Aegean at the Final Bid Prices would be "based on Seller's shore tank measurement, and findings from a mutually appointed independent inspector shall be final and binding." *See id.* at 3.

27.    The Purchase Order not only fails to mention any side deal between the Debtors and Aegean regarding the quantity of fuel oil subject to the Final Bid Prices, but also expressly disclaims the existence or effectiveness of any prior oral agreements or representations. Section 11 of the Purchase Order specifically provides that the Purchase Order, the Sale Procedures Order, the approved Sale Procedures, and the Sale Order collectively contain "the entire agreement between the parties" and supersede "all previous negotiations, representations, agreements or commitments" relating to the sale of the Vopak Oil. *See id.* at 4. Section 11 of the Purchase Order further provides that Aegean "acknowledges that in entering into this contract it has not relied on any representations, warranties, statements or undertakings except those which are expressly set out herein, or [specifically] enumerated in the Sale Procedures." *See id.*

28.    On December 8, 2014, the Court entered the Sale Order. By the Sale Order, the Court approved the sale of all of the Vopak Oil to Aegean free of all liens, claims and encumbrances pursuant to § 363(f) of the Bankruptcy Code and the terms of the Purchase Order. *See* Sale Order at ¶ 1. In the Sale Order, the Court approved the Debtors' business justification for the expedited sale of the Vopak Oil to Aegean – namely, minimizing the Debtors' exposure to "the price volatility of this asset" and avoidance of "decline and devaluation of the Vopak Oil." *See id.* at ¶ J.

29.    The Court directed the Debtors and Aegean to cooperate "to ensure that the transaction contemplated in the Purchase Order and the other Transaction Documents is

consummated." *See id.* at ¶ 39. The Court further ordered that "the terms and provisions of the Purchase Order … as well as the rights and interests granted pursuant to this Order and the Purchase Order … shall be specifically performable and enforceable against and binding upon the Debtors, their estates and the Purchaser." *See id.* at ¶ 42.

30. Finally, in the Sale Order the Court retained exclusive jurisdiction "to enforce and implement the terms and provisions of the Purchase Order," including jurisdiction to "compel delivery of the purchase price or performance of other obligations owed to the Debtors." *See id.* at ¶ 47.

31. Subsequent to the entry of the Sale Order, a mutually appointed independent inspector determined that the quantity of the Vopak Oil purchased by Aegean exceeded the estimates indicated in the Purchase Order. Unfortunately for Aegean, the price of oil on the international markets declined between its execution of the Purchase Order and the inspection. According to Bunkerworld, the average price of fuel oil at Los Angeles continued to fall between November 14, 2014 and December 14, 2014. As of December 14, 2014, the average price of RMG 380 at Los Angeles was $411.00 per metric ton – $40.00 per metric ton less than on November 14, 2014. *See* Exhibit A at 1. Aegean's Final Bid Price for RMG 380 in the Purchase Order is $368.61 per metric ton. According to a screen capture from Bunkerworld detailing prices for the week ending December 30, 2014 – attached hereto as <u>Exhibit C</u> – the price of RMG 380 at Los Angeles on December 30, 2014 was $355.00 per metric ton.

32. The increased volume of the Vopak Oil to be purchased at the Final Bid Prices will result in a lost speculative bet for Aegean. Sale of this excess quantity of the Vopak Oil at the Final Bid Prices approved by the Court in the Sale Order will result in approximately $885,000 in additional sale proceeds for the Debtors' estates compared to a sale of only the pre-

11

Sale Order estimated volume of the Vopak Oil. Aegean thus has every incentive to stall closing on its purchase of the Vopak Oil in the hope that fuel oil prices will recover from their free fall – or to limit its losses by reducing the price it must pay for the amount of the Vopak Oil in excess of the Debtor's pre-Sale Order estimates.

33.     The Movants believe that Aegean's obligation to purchase all of the Vopak Oil at the Final Bid Prices indicated in the Purchase Order is plain and unambiguous, and unaffected by any alleged off-the-record discussions between Aegean and the Debtors at the auction that were never even reflected on the auction transcript. Accordingly, the Movants hereby seek to enforce the Purchase Order and the Sale Order against Aegean, as contemplated by paragraphs 42 and 47 of the Sale Order.

34.     The Movants further seek sanctions against Aegean in the form of the costs and expenses incurred by the Movants in preparing, filing, and prosecuting this Motion. Aegean's sole justification for not closing on its agreement to purchase all of the Vopak Oil at the Final Bid Prices – the purported side deal with the Debtors – is completely unsupported by any credible evidence. Further, even if this side deal exists, the plain, unambiguous terms of the Purchase Order render it totally irrelevant – legally inadmissible – to Aegean's obligations under the Purchase Order and the Sale Order. Aegean's argument in support of its stall tactics is factually untrue and legally frivolous – and merits the imposition of sanctions against Aegean. The Debtors' estates should not bear the costs of enforcing Aegean's unambiguous and unequivocal promise to purchase all of the Vopak Oil at the Final Bid Prices agreed in the Purchase Order and approved in the Sale Order.

**ARGUMENT AND AUTHORITIES**

35. "Courts repeatedly emphasize the importance of enforcing the finality of bankruptcy sales." *In re Target Two Assoc., L.P.*, 2006 WL 3068668, *6 (S.D.N.Y. Oct. 27, 2006). "[I]n order to provide stability and finality to judicial sales of a debtor's assets pursuant to section 363 of the Bankruptcy Code, successful bidders are bound and obligated to consummate the sale when it is authorized by the bankruptcy court … Thus, the successful bidder at a bankruptcy sale is bound by the offer as stated and as embodied in an approval order." *See In re Chateaugay Corp.*, 186 B.R. 561, 593-94 (Bankr. S.D.N.Y. 1995). This is especially important "because judicial sales, unlike ordinary private commercial transactions, involve parties other than the particular parties to the transaction … To allow a purchaser to bid before a court, to have lienholders and other creditors agree to the bid and then have purchasers renege upon further inquiry into the nature of the property 'would interject an intolerable element of uncertainty and inequity into judicial sales.'" *See id.* (quoting *In re Winston Inn & Restaurant Corp.*, 120 B.R. 631, 637 (E.D.N.Y. 1990)).

36. Courts routinely enter orders compelling successful bidders at bankruptcy sales to close on the court-approved terms, or compel forfeiture of deposits placed as liquidated damages to the bankruptcy estate. *See Target Two Assoc.*, 2006 WL 3068668 at *6 (collecting cases). "It is well settled that an Order of Sale by the Bankruptcy Court cannot be collaterally attacked … This general rule has been applied to preclude purchasers whose bids have been accepted and authorized by the Bankruptcy Court from reneging on their obligations to consummate the purchase as authorized at a judicial sale." *In re Oyster Bay Cove, Ltd.*, 161 B.R. 338, 342 (Bankr. E.D.N.Y. 1993). "The successful bidder at a bankruptcy sale is bound by the offer as stated and as embodied in an approval order unless the order is successfully appealed or

the court which confirmed the sale vacates the confirming order." *In re Silver Bros. Co.*, 179 B.R. 986, 1007 (Bankr. D. N.H. 1995).

37. "The law has long cautioned buyers at judicial sales that they bid at their own risk as to the fair value of the property offered." *Id.* Allowing a purchaser to escape enforcement of a court-approved bankruptcy sale due to the purchaser's misapprehension of the value of the property purchased "would give an advantage to those who blithely bid in ignorance at the expense of those who have made more careful inquiry into the reasonable value of the property offered for sale." *See id.* at 637. "A court of equity will not undertake, any more than a court of law, to relieve a party from the consequences of his own carelessness." *Oyster Bay*, 161 B.R. at 343 (quoting *Slaughter's Administrator v. Gerson*, 80 U.S. 379, 13 Wall. 379, 20 L.Ed. 627 (1872)). "If there is any ambiguity in the stated terms of sale the bidder has the obligation to bring that matter up for clarification before the call of the sale or the bidder will otherwise be strictly bound to the terms of the sale as called." *Silver Bros.*, 179 B.R. at 1007; *In re Suncoast Towers South Assoc.*, 1999 WL 549678, *23-24 (Bankr. S.D. Fla. June 17, 1999) (finding that if bidder believed that any ambiguity existed as to assets being sold, bidder bore burden "to seek clarification in this regard prior to the Sale Hearing").

38. In the instant Case, this Court retained exclusive jurisdiction "to enforce and implement the terms and provisions of the Purchase Order," including jurisdiction to "compel delivery of the purchase price or performance of other obligations owed to the Debtors." *See* Sale Order at ¶¶ 42, 47. The Movants submit that the Court should exercise its authority and compel Aegean to perform by purchasing all of the Vopak Oil at the Final Bid Prices indicated in the Purchase Order and approved in the Sale Order.

39. Aegean does not seem to dispute that the plain terms of the Purchase Order and the Sale Order, in accordance with the Sale Procedures Order, provide that it must purchase all of the Vopak Oil at the Final Bid Prices. Rather, Aegean has asserted to the Movants that it is not obligated to purchase all of the Vopak Oil at the Final Bid Prices because it agreed with the Debtors in an off-the-record conversation during the auction that it would not be obliged to pay the Final Bid Prices on any amount of the Vopak Oil in excess of the then-available volume estimates. The Debtor absolutely denies that it entered into any side deal of this nature; again, the auction transcript does not reflect this, and if such a modification occurred, Aegean should have clarified on the record.

40. However, assuming for the sake of argument that the Debtors did provide such assurances, the plain language of the Purchase Order – as approved by the Sale Order – renders such assurances totally irrelevant. Section 11 of the Purchase Order specifically provides that the Purchase Order, the Sale Procedures Order, the approved Sale Procedures, and the Sale Order collectively contain "the entire agreement between the parties" and supersede "all previous negotiations, representations, agreements or commitments" relating to the sale of the Vopak Oil. *See* Purchase Order, Exh. I to Sale Order at 4. Section 11 of the Purchase Order further provides that Aegean "acknowledges that in entering into this contract it has not relied on any representations, warranties, statements or undertakings except those which are expressly set out herein, or [specifically] enumerated in the Sale Procedures." *See id.*

41. Evidence of the purported side deal between Aegean and the Debtors at the auction is inadmissible parol evidence in light of these provisions. The parol evidence rule bars the admission of evidence outside of the four corners of an agreement for the purpose of varying or contradicting the terms of such agreement. *Tallmadge Bros., Inc. v. Iroquois Gas*

15

Case 14-51720    Doc 239    Filed 12/30/14    Entered 12/30/14 23:41:42    Desc Main

*Transmission System, L.P.*, 252 Conn. 479, 502-03, 746 A.2d 1277 (Conn. 2000). "[C]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law.... Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts." *Id.* at 505-06 (quoting *Robert Lawrence Assoc., Inc. v. Del Vecchio*, 178 Conn. 1, 21-22, 420 A.2d 1142 (Conn. 1979)).

42. The plain terms of the Purchase Order, as approved by the Sale Order, provide that Aegean agrees to buy all of the Vopak Oil at the Final Bid Prices, in a quantity to be exactly determined by an independent measurement prior to closing. There is no ambiguity regarding Aegean's obligation to pay the Final Bid Prices per metric ton for any volume of the Vopak Oil in excess of prior estimates. Aegean cannot use a purported oral side deal with the Debtors as parol evidence to contradict its unambiguous obligations under the Purchase Order.

43. This is especially true considering the Court-approved nature of the sale at issue. As discussed in the cases cited above, a court-approved §363 sale is not equivalent in all respects to a private sale transaction. There are other parties to consider besides the actual parties to the contract – here, the Court, the Committee, and other creditors. *See Chateaugay Corp.*, 186 B.R. 561, 593-94. These third parties relied on the plain terms of the Purchase Order, without any mention of any side deal relating to excess volume on the record. The Court itself relied on the terms on the record when entering the Sale Order. If there was an undocumented side deal, or any ambiguity requiring such a side deal, then Aegean should have raised the issue prior to entry of the Sale Order. *See Silver Bros.*, 179 B.R. at 1007.

16

**REQUEST FOR SANCTIONS**

44. Aegean's unjustified failure to comply with the unambiguous terms of the Sale Procedures Order, the Sale Procedures, the Purchase Order, and the Sale Order forced the Movants to prepare, file, and prosecute this Motion. Therefore, Movants request that the Court exercise its inherent powers to award sanctions against Aegean and in favor of the Movants equal to the attorneys' fees and costs of the Movants in preparing, filing, and prosecuting this Motion. A bankruptcy court has inherent authority to award sanctions against a party for failure to close on a court-approved asset sale under § 363. *See Crystal Palace Gambling Hall, Inc. v. Mark Twain Indus., Inc.*, 817 F.2d 1361, 1365-66 (9th Cir. 1987) (affirming order of sanctions in favor of purchaser against debtor-in-possession that declined to close on court-approved sale after better offer arose); *In re Frankel*, 191 B.R. 564, 574-75 (Bankr. S.D.N.Y. 1995) (awarding sanctions in favor of trustee against winning bidder for, among other things, his failure to "offer any colorable or credible justification for refusing to comply with his contractual and Court-ordered obligation").

45. Additionally, the Court may sanction an attorney pursuant to Rule 11 of the Federal Rules of Civil Procedure, as made applicable herein by Rule 9011 of the Federal Rules of Bankruptcy Procedure. Should Aegean assert its defense of a purported oral agreement, which is without basis, precedent or evidentiary support, the Movants request that the Court consider Rule 11 sanctions.

**CONCLUSION**

46. For the reasons stated above, the Movants respectfully request that the Court enter an order granting this Motion, directing Aegean to purchase all of the Vopak Oil at the Final Bid Prices indicated in the Purchase Order, awarding sanctions to the Movants as

compensation for filing this Motion to address Aegean's unjustified noncompliance, and granting such other and further relief as the Court deems just and proper.

Dated:  December 30, 2014

| | |
|---|---|
| **MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP** | **HUNTON & WILLIAMS LLP** |
| By: */s/ Natalie D. Ramsey* <br> Natalie D. Ramsey (NY #5242730) <br>     (admitted *pro hac vice*) <br> Joseph O'Neil (NY #2596435) <br>     (admitted *pro hac vice*) <br> Davis Lee Wright (NY #4761300) <br>     (admitted *pro hac vice*) <br> 437 Madison Avenue, 29th Floor <br> New York, NY 10022 <br><br> -and- <br><br> **ROBINSON & COLE LLP** <br> Michael R. Enright (ct10286) <br> Patrick M. Birney (ct19875) <br> 280 Trumbull Street <br> Harford, CT 06103 <br> Telephone: (860) 275-8290 <br> Facsimile: (860) 275-8299 <br> menright@rc.com <br> pbirney@rc.com <br><br> *Proposed Counsel for the Debtors and Debtors in Possession* | By: */s/ Gregory F. Lang* <br> Peter S. Partee, Sr. <br>     (admitted *pro hac vice*) <br> Michael P. Richman <br>     (admitted *pro hac vice*) <br> Andrew Kamensky <br>     (admitted *pro hac vice*) <br> Gregory F. Lang (ct14112) <br> 200 Park Avenue <br> New York, NY 10166-0136 <br> Telephone: (212) 309-1000 <br> Facsimile: (212) 309-1847 <br> ppartee@hunton.com <br> mrichman@hunton.com <br> akamensky@hunton.com <br><br> *Proposed Counsel for The Official Committee of Unsecured Creditors of O.W. Bunker Holding North America Inc., et al.* |