## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| O.W. Bunker Holding North America Inc., *et al.*,[1] | : | Case No. 14-51720 (JAM) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

### DECLARATION OF HANS STAAL JONASSEN IN SUPPORT OF CONFIRMATION OF THE DEBTORS' FIRST MODIFIED LIQUIDATION PLANS

I, Hans Staal Jonassen, declare under penalty of perjury:

1.      I am the Authorized Officer for each of O.W. Bunker Holding North America Inc., O.W. Bunker USA Inc., and O.W. Bunker North America Inc. (collectively, the "Debtors" and each a "Debtor") I have held this or other positions with one or more of the Debtors since April 1, 2012.

2.      On November 13, 2014 (the "Petition Date"), the Debtors each sought relief under Title 11 of the United States Code (the "Bankruptcy Code") with the goal of liquidating their assets and maximizing their value for the benefit of Holders of Claims and Equity Interests.

3.      Since the Petition Date, the Debtors have continued in possession of their properties and the management of their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

4.      The Debtors currently have no operating assets and the workforce has

---

[1] The last four digits of the Debtors' taxpayer identification numbers follow in parentheses:  O.W. Bunker Holding North America Inc. (7474), O.W. Bunker North America Inc. (7158) and O.W. Bunker USA Inc. (3556).  The Debtors' address is: OW Bunker c/o Alvarez & Marsal, LLC, Attn: Scott Anchin, 600 Madison Avenue, 7th Floor, NY, NY 10022.

been reduced to only two.  OWB Holding has no assets apart from its Equity Interests in OWB

NA and OWB USA.  The assets of OWB NA and OWB USA are comprised primarily of

proceeds from the sale of assets during the course of these cases as well as their interests in their

Supply Receivables.

5.      The Debtors seek to confirm the *Debtors' First Modified Liquidation*

*Plans* [Docket No. 1071] (as may be modified and/or amended, the "Plan"), at the Confirmation

Hearing scheduled for December 10, 2015.

6.      I submit this Declaration in support of confirmation of the Plan.  Any

capitalized term not expressly defined herein shall have the meaning set forth in the Plan or in

the First Amended Disclosure Statement with Respect to the Debtors' Liquidation Plans (the

"Disclosure Statement").  Except as otherwise indicated, all facts set forth in this Declaration are

based upon my personal knowledge, my review of relevant documents, information provided to

me by the Debtors' former personnel and others, or my opinion, based upon my experience and

knowledge of the Debtors' operations and financial condition.  I was personally present at a

number of the mediation sessions with Honorable Alan H. Nevas (ret.).  If I were called upon to

testify, I could and would testify competently to the facts set forth herein.  I am authorized to

submit this Declaration.

# I.      BACKGROUND AND OVERVIEW OF THE PLAN

## A.      General

7.      OWB Holding is a Connecticut corporation and is the direct, one hundred

percent Holder of all of the Equity Interests of OWB NA (a Connecticut corporation) and OWB

USA (a Texas corporation).  OWB Holding does not have any active business operations.  OWB

Holding, OWB NA, and OWB USA are part of an international family of companies

(collectively, the "OW Bunker Companies") owned directly or indirectly by OW Bunker A/S, an

entity organized under the laws of Denmark.  Prior to the Petition Date, OWB NA and OWB

USA conducted the United States operations of the OW Bunker Companies, providing marine

fuel oil (also known as "bunkers") to vessels on the order of various shipping companies and

vessel interests, including container, bulk, and tanker ships as well as passenger cruise lines and

the off-shore shipping industry.

8.     The OW Bunker Companies, originally founded in 1980 in Aalborg,

Denmark, were a part of Ove Wrist, a Danish ship handling company dating back to the 1950s.

Following a decade of expansion limited to Scandinavia and Northern Europe, the OW Bunker

Companies started Singapore operations in 1992.  Beginning in 2007, the OW Bunker

Companies entered into a period of rapid expansion, ultimately becoming a leading global

marine fuel company with operations in 29 countries and in some of the world's busiest and most

important ports.  Globally, the OW Bunker Companies controlled approximately 7% of the

marine fuel market.

9.     OWB NA generally operated on the physical distributor side of the OW

Bunker Companies, sourcing bunkers from oil companies and refineries, transporting and storing

the bunkers, and blending the fuel to the specifications requested by its customers.  OWB USA

operated on the reselling side of the OW Bunker Companies, managing the supply within the

United States of bunkers for customers, in liaison with other OW Bunker Companies.

10.     Each of the Debtors' respective boards of directors is currently composed

of Hans Staal Jonassen and Adrian Tolson.  Hans Staal Jonassen is the sole officer for each of

the Debtors.

**B.     Reasons for Commencing the Chapter 11 Cases**

11.     In March 2014, OW Bunker A/S and Altor Fund II launched an initial

public offering ("IPO") of OW Bunker A/S on NASDAQ Copenhagen in one of the largest

transactions in Denmark in this decade.  The IPO valued OW Bunker A/S at approximately $980

million.

12.     On October 23, 2014, OW Bunker A/S indicated that it had recognized

"unrealized risk management" losses of $24.5 million due to a "slide in oil price."  Shortly

thereafter, on November 5, 2014, those potential trading losses were increased from $24.5

million to $150 million.  Additionally, OW Bunker A/S disclosed that it discovered suspected

fraudulent activity by senior employees of its Singapore-based subsidiary, Dynamic Oil Trading

(Singapore) Pte. Ltd., amounting to an additional $125 million in losses.  As a result of these

losses,  less than six months after the IPO, equity at OW Bunker A/S was effectively eliminated.

13.     In light of these reports, thirteen of OW Bunker A/S' fifteen banks, who

were collectively owed approximately $650 million, refused to extend additional credit.  The

continued extension of credit was absolutely vital for the OW Bunker Companies because of the

nature of the marine fuel supply market.  The OW Bunker Companies purchased from suppliers

on credit and delivered to customers on credit.  The termination of borrowing essentially

eliminated the OW Bunker Companies' ability to operate their businesses.

14.     Trading of OW Bunker A/S' shares was suspended by NASDAQ

Copenhagen on November 5, 2014.  On November 6, 2014, OW Bunker A/S announced the

commencement of an in-court restructuring of each of O.W. Bunker & Trading A/S and O.W.

Supply & Trading A/S, two Danish subsidiaries, at the probate court in Denmark.  The in-court

restructuring failed and the Danish subsidiaries filed for bankruptcy in Aalborg.  The probate

court entered an order declaring the Danish subsidiaries bankrupt, and appointed legal and

financial trustees to wind up the businesses on November 7, 2014.

15.     Following the collapse of the Debtors' parent in Denmark, the Debtors were left in a near impossible position. With their vendors and creditors refusing to extend credit, alleging defaults, issuing payment accelerations, and demanding reclamation and cash on delivery demands, the Debtors found themselves with limited options. Accordingly, in an operation of their business judgment, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions in the Bankruptcy Court on the Petition Date.

### C.     The Settlements Leading to the Plan

16.     Prior to the Petition Date, the Debtors investigated the lending provided pursuant to the Finance Documents and concluded that facts existed to support allegations that the liens granted to ING Bank constituted possible avoidable preferences. As a result, the Debtors commenced an adversary proceeding against ING Bank on November 25, 2014. *See* Complaint [Docket No. 1], Adv. Case No. 14-5063 (Bankr. D. Conn.). ING Bank has disputed the contentions in the Complaint. Pursuant to a settlement among the Debtors, the Committee, and ING Bank which settlement is embodied in the Plan, the ING Adversary will be dismissed by the Bankruptcy Court with prejudice on the Effective Date.

17.     Under this settlement, ING Bank's asserted secured claims of approximately $760,000,000, will be an allowed general unsecured claim against each of OWB NA and OWB USA, except to the extent of the value of certain insurance receivables pledged to ING Bank by OWB NA and OWB USA. The unsecured Claims asserted by ING Bank against each of OWB NA and OWB USA as assignee of intercompany receivables pledged to it pursuant to the Finance Documents will be Allowed as a general unsecured claims in the respective approximate amounts of $49.5 million and $50.7 million (and remain subject to final reconciliation). ING Bank has asserted that a substantial portion of the intercompany Claims it

has asserted as assignee are entitled to priority treatment under section 503(b)(9) of the

Bankruptcy Code.  A range of the ING Claims was included in the Plan Supplement.  Pursuant to

the settlement with the Debtors embodied in the Plan, ING Bank has agreed to forego any rights

it may have under section 503(b)(9) of the Bankruptcy Code.  ING Bank has also agreed to turn

over the Supply Receivables receipts and Additional Collections to the Liquidating Trusts for

ultimate distribution to holders of allowed claims.

18.     Additionally, as described above ING Bank has agreed that its allowed

general unsecured claims shall be treated less favorably than Allowed General Unsecured Claims

of Holders that make the applicable Class A Election.  Such Holders are those that (a) are

unaffiliated with the OW Bunker Companies, (b) assign to the applicable Liquidating Trust any

and all of such Holders' Assigned Rights, (c) return any and all proceeds collected on behalf of

the Assigned Rights to the applicable Liquidating Trust, and (d) waive their right to assert that

their Claims should be afforded administrative priority status under section 503(b)(9) of the

Bankruptcy Code, except as otherwise provided in the Plan.

19.     Pursuant to the agreements and compromises with ING Bank embedded in

the Plan, the Debtors and the Liquidating Trusts will not pursue any recovery from bunker

supply transactions where the Debtors acted as a Physical Supplier or an Intermediate Supplier.

Instead, the Debtors and the Liquidating Trusts will pursue recovery from only those customers

and their vessels only in respect of Supply Receivables that arise from a Debtor acting as the

Contract Supplier.  As a result of this agreement, OWB USA and OWB NA (i) have, with the

cooperation of ING Bank, issued an agreed form of demand letter (the "Demand Letter") to

customers with outstanding Supply Receivables beginning in early October; and (ii) will

abandon those litigation claims, thereby reducing legal expenses related to, pending maritime-

related interpleader and vessel arrest actions where the Debtors' costs of litigation greatly exceed

any potential recovery.

20.    Finally, ING Bank, the Committee, and the Debtors have agreed to certain

releases as part of the Plan.  These releases are integral to the Plan and the agreements reached

with ING Bank in connection with settling the Adversary Proceeding and providing a liquidation

preference to Class A electing creditors.

21.    Certain Physical Suppliers have asserted claims seeking treatment

pursuant to section 503(b)(9) of the Bankruptcy Code (the "Supplier Section 503(b)(9) Claims")

against OWB NA and OWB USA relating to the alleged marine bunker transactions.  OWB USA

objected to these claims predominantly on the ground that OWB USA never took physical

possession of the marine fuel bunkers as required by 11 U.S.C. § 503(b)(9) and, therefore, the

claimants were "drop-shippers" and not entitled to administrative expense priority for their

claims.  The Debtors believe that no such claims should be allowed as priority claims.  OWB NA

objected on the basis that all of the Physical Suppliers in its case exercised their rights to reclaim

their marine fuel bunkers, that reclamation is a Physical Suppliers' exclusive remedy, and that an

administrative priority should be allowed, if at all, only for that portion of the marine fuel

delivered to a customer's vessel and not reclaimed by a physical supplier.

22.    In connection with Plan confirmation, the Debtors were able to (i) settle

the OWB NA-related Supplier Section 503(b)(9) Claims, (ii) settle certain of the OWB USA-

related Supplier Section 503(b)(9) Claims, and (iii) enter into agreements with NuStar Supply &

Trading LLC, NuStar Energy Services, Inc., NuStar Terminals Marine Services N.V., Chevron

Marine Products LLC, O'Rourke Marine Services L.P., L.L.P, and Dolphin Marine Fuels LLC

that no reserve shall be required for such entities and to defer litigation on the Debtors' objection

to their respective Supplier Section 503(b)(9) Claim until a specific period of time elapsed after the Effective Date in order to permit resolution of such entities claims against vessels first. These agreements will also permit confirmation of the Plan.

**D.      Solicitation and Voting Summary**

23.      On October 29, 2015, the Court entered its order (the "Solicitation Procedures Order") finding that the Disclosure Statement contained adequate information and approving the Debtors' proposed solicitation procedures.  The Debtors solicited the Plan on November 3, 2015, forwarding tailored ballot packages (the "Voting Solicitation Packages") to the individual Holders of Claims in each of Classes 4 and 10.  Lucid Issuer Service Limited, a third-party vendor retained by ING Bank, solicited claimants in each of Classes 3 and 9 and provided a master ballot to the Debtors.  Solicitation concluded on December 3, 2015 at 4:00 p.m. (Eastern Time).  Classes 3, 4, 9, and 10 were the only classes entitled to vote on the Plan and I understand that literally every Class entitled to vote on the Plan (Classes 3, 4, 9, and 10) voted affirmatively to accept the Plan.

24.      The Debtors mailed notice of the Confirmation Hearing and the deadline and procedures for filing objections to confirmation to all of the Debtors' Holders of Claims and Equity Interests who were eligible to vote on the Plan.  I was advised that the deadline for filing objections to confirmation of the Plan was 4:00 p.m. Eastern Time on December 3, 2015.

25.      It is my understanding that Class 1 (Non-Tax Priority Claims Against OWB USA), Class 2 (Secured Claims Against OWB USA), Class 7 (Non-Tax Priority Claims Against OWB NA), and Class 8 (Secured Claims Against OWB NA) are Unimpaired under the Plan, and thus are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code (the "Deemed Accepting Classes").  I understand that each of these parties

received notice of their non-voting status.

26.     I further understand that Class 5 (Subordinated Claims Against OWB USA), Class 6 (Equity Interests in OWB USA), Class 11 (Subordinated Claims Against OWB NA), and Class 12 (Equity Interests in OWB NA) are not entitled to receive or retain any property under the Plan on account of the class members' claims or interests and accordingly are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code (the "Deemed Rejecting Classes").  Each of these parties received notice of their non-voting status.

27.     On November 18, 2015, the Court entered an order (the "Plan Modification Order") permitting certain non-adverse plan modifications, which the Debtors included in the Plan Supplement.  In addition to the plan modifications, the Plan Supplement contained the following  information: (i) the Liquidating Trust Agreement of O.W. Bunker North America Inc., (ii) the Liquidating Trust Agreement of O.W. Bunker USA Inc., (iii) the identity of the Liquidating Trustee, (iv) a summary of ING Bank Direct and Assignee Claims, (v) a section 503(b)(9) claim schedule for OWB NA, (vi) a schedule of assumed executory contracts, and (vii) an updated liquidation analysis.  The Debtors served copies of the Plan Supplement on Holders of Class 4 Claims and Class 10 Claims.

## II.     THE PLAN MEETS ALL APPLICABLE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129(a)

28.     I have been informed that the Bankruptcy Court may confirm a plan if the requirements of section 1129(a)(1)-(a)(13), and 1129(b) of the Bankruptcy Code are satisfied and that the Debtor, as the proponent of the Plan has the burden of proof to demonstrate that the requirements are satisfied.  It is my understanding that the Plan satisfies the requirements under section 1129(a) and (b) and that the Plan should be confirmed.

**A.      The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code**

29.      Except for Administrative Claims, Fee Claims, and Priority Tax Claims, which I have been advised are not classified pursuant to the Bankruptcy Code, Article II of the Plan designates twelve separate Classes of Claims and or Equity Interests.  See Plan, Article II-III.

30.      The Debtors consulted with counsel and financial advisers and considered a number of factors in classifying Claims and Equity Interests.  Among other things, the Debtors considered: (i) whether the Claims were Secured or General Unsecured Claims; (ii) whether the General Unsecured Claims were Priority or Non-Priority Claims; and (iii) the terms of the ING Settlement.

31.      It is my understanding that all Claims and/or Equity Interests within each class are substantially similar to the other Claims and/or Equity Interests in each Class.  I Understand that:

Classes 1 (Non-Tax Priority Claims Against OWB USA) and 7 (Non-Tax Priority Claims Against OWB NA) are composed of Claims, other than Administrative Claims or Priority Tax Claims, that are entitled to priority in payment under section 507 of the Bankruptcy Code.

Classes 2 (Secured Claims Against OWB USA) and 8 (Secured Claims Against OWB NA) are composed of Claims to the extent reflected in the Debtors' Schedules and Statements or in a proof of claim, secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with sections 506(a) and/or 553 of the Bankruptcy Code.

Classes 3 (OWB USA Affiliated Unsecured Claims) and 9 (OWB NA Affiliated Unsecured Claims) are generally composed of (i) ING Bank's intercompany claims against OWB NA and OWB USA held by OWB NA, OWB USA, or one of the Debtors' foreign affiliates and assigned to ING Bank pursuant to the English Credit Agreement, and (ii) ING Bank's claims against OWB NA and OWB USA in connection with the respective Debtor's guaranty of obligations under the Finance Documents.  I understand that a portion of the Claims in Classes 3 and 9 may be entitled priority treatment under Section 503(b)(9) of the Bankruptcy Code, but these Classes consented to subordinate these priority claims to other Classes of General Unsecured Claims and allow Holders making the

Class A Election in Classes 4 and 10 to receive a liquidation preference.

Classes 4 (OWB USA Unaffiliated Trade Claims) and 10 (OWB NA Unaffiliated Trade Claims) are generally composed of a Debtor's unsecured trade vendors. Holders of Allowed Claims in Classes 4 and 10 receive a liquidation preference representing a 40% claim recovery against OWB USA (the "OWB Liquidation Preference") or a 25% claim recovery against OWB NA (the "OWB NA Liquation Preference") unless the Holder affirmatively opts out. Those making the Class A Election are classified in subclass (a); those not making the Class A Election (collectively, the Non-Electing Claimants") are classified in subclass (b). Those making the Class A Election receive the liquidation preference up to specific dollar cap and then share *pari passu* with all of the applicable Debtor's unsecured creditors.

Classes 5 (Subordinated Claims Against OWB USA) and 11 (Subordinated Claims Against OWB NA) are generally composed of Claims that are subordinated to general unsecured claims pursuant to sections 510(b) or (c) of the Bankruptcy Code.

Classes 6 (Equity Interests in OWB USA) and 12 (Equity Interests in OWB NA) are generally composed of holders of any "equity security" as such term is defined in section 101(16) of the Bankruptcy Code, or any other instrument evidencing an ownership interest in a Debtor.

32.     Based on the foregoing, the Debtors believe that the Plan's classification scheme is proper and satisfies section 1122 because it recognizes the different legal and equitable rights of the Holders of Claims and/or Equity Interests.

**B.**     Mandatory Contents of the Plan

**(1)     The Plan Properly Classifies and Designates the Treatment of Claims and Equity Interests (Sections 1123(a)(1) through 1123(a)(4)**

33.     I understand that Article III of the Plan (i) designates Classes of Claims and Equity Interests, (ii) designates which Classes of Claims and Equity Interests are not Impaired as well as (iii) the proposed treatment of each of the Classes of Claims and Equity Interests in accordance with sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code, respectively. Further, it is my understanding that Article III of the Plan treats each Claim or Equity Interest within a Class the same as each other Claim or Equity Interests in that Class,

unless the Holder consents to a less favorable treatment for its Claim or Equity Interest.  As a

result, it is my belief that the Plan satisfies sections 1123(a)(1) through 1123(a)(4) of the

Bankruptcy Code.

> **(2)      Means for Implementation (Section 1123(a)(5))**

34.      I have been advised that section 1123(a)(5) of the Bankruptcy Code

requires that the Plan provide "adequate means" for its implementation and that the Plan satisfies

this requirement by setting forth in Article V the primary provisions necessary to implement the

Plan.

35.      I have been advised that Plan's implementation will be managed primarily

by the formation of the Liquidating Trusts that will: (i) prosecute certain maritime-related causes

of action and bankruptcy related causes of action; (ii) litigate the allowance of certain section

503(b)(9) priority claims, (iii) resolve Disputed Claims; (iv) administer the Plan; (v) file

appropriate tax returns; and (vi) dissolve OWB Holding.  The course of the funds for these

activities will come primarily from the Supply Receivables receipts and the Debtors' current

bank balances.

36.      It is my belief that these provisions provide "adequate means" for the

implementation of the Plan and satisfy section 1123(a)(5) of the Bankruptcy Code.

> **(3)      Charter Provisions (Section 1123(a)(6))**

37.      I understand that section 1123(a)(6) of the Bankruptcy Code requires the

inclusion of provisions in the charters of the entities described therein that (i) prohibit the

issuance of nonvoting equity securities; and (ii) provide for an "appropriate distribution" of

voting power among those securities possessing voting power. I understand that as the Debtor is

liquidating, no new capital stock shall be authorized or issued and this provision does not apply.

**(4)** **Selection of the Liquidating Trustees is Consistent with the Interest of Creditors and with Public Policy (Section 1123(a)(7))**

38.     Counsel to the Debtors have informed me that the Bankruptcy Code requires that a plan contain provisions that are consistent with the interest of creditors and equity security holders and with respect to the manner of selection of any officer, director, or trustee under the plan and that the Bankruptcy Court directs the court to scrutinize the methods by which the management of the corporation post-confirmation is to be chosen to provide adequate representation of those with a financial stake.

39.     The Plan provides for the formation of the OWB USA Liquidating Trust and the OWB NA Liquidating Trust, and the Liquidating Trustees, identified in the Plan Supplement, were jointly selected by the Debtors, the Committee, and ING Bank.  The respective Liquidating Trust Agreements detail the governance of the Liquidating Trusts.  I understand that Classes 3, 4, 9, and 10, the only parties with an economic stake in the Liquidating Trusts, effectively selected the Liquidating Trustee.  Accordingly, I have been advised that the requirements of section 1123(a)(7) of the Bankruptcy Code are satisfied.

**(5)** **Discretionary Contents of the Plan (Section 1123(b))**

40.     I have been advised that section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan, but are not required and that the Plan contains a number of these discretionary provisions.

41.     For example, I know that: (i) Article III of the Plan provides for certain Classes of Claims and Equity Interests to be Impaired while leaving others Unimpaired, (ii) Article XI of the Plan also provides for the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Leases to which one of the Debtors is a party; (iii) that Articles III and V of the Plan incorporate the terms of the ING Settlement, and (ii) that Article V

of the Plan provides for the Debtors' abandonment of certain Causes of Action where OWB

USA and/or OWB NA were Intermediary Suppliers in a bunker supply transaction chain.

Finally, the Plan includes additional appropriate provisions that I have been advised are not

inconsistent with the applicable provisions of the Bankruptcy Code, including the provisions for

implementation of the Plan and for making distributions pursuant to the Plan as authorized by 11

U.S.C. § 1123(b)(6).

### (6)      Executory Contracts and Unexpired Leases

42.      It is my understanding that the treatment of Executory Contracts and

Unexpired Leases is set forth in Article XI of the Plan.  I understand that the Plan provides that

Executory Contracts and Unexpired Leases are deemed rejected unless scheduled in the Plan

Supplement and that Exhibit 6 of the Plan Supplement included an executory contract

assumption schedule.

43.      It is my belief that the Debtors exercised appropriate business judgment in

determining whether to assume, assume and assign, or reject each of its Executory Contracts and

Unexpired Leases.

### C.      The Debtors Have Satisfied Section 1129(a)(2)

44.      The Debtors have operated as debtors-in-possession under sections 1107

and 1108 of the Bankruptcy Code since the Petition Date and, to the best of my knowledge, have

complied with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules as well

as applicable non-bankruptcy law, unless otherwise permitted by order of this Court.

### (1)      The Debtors Have Complied with the Disclosure Requirements of Section 1125 of the Bankruptcy Code

45.      It is my understanding that by its Solicitation Procedures Order, the

Bankruptcy Court approved the Disclosure Statement pursuant to section 1125(b) of the

Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors and equity interest holders to make an informed judgment whether to accept or reject the Plan.  In addition, the Solicitation Procedures Order approved the Debtors' form of Ballots and proposed solicitation procedures, established voting procedures, set the date, time and place for the Confirmation Hearing, and prescribed the form and manner of notice thereof.

46.     Legal counsel advised me that this Court approved (a) all materials to be transmitted to those creditors and interest holders entitled to vote on the Plan, (b) the timing and method of delivery of those materials, (c) the rules for tabulating votes to accept or reject the Plan, and (d) the timing and method of notice of the Confirmation Hearing and related matters.

47.     I am advised that as authorized by the Solicitation Procedures Order, the Debtors mailed, or caused to be mailed, copies of: the Voting Solicitation Package to all known record Holders entitled to vote on the Plan as well as all parties entitled to receive notice as set forth in Solicitation Procedures Order.

48.     I represent that the Debtors did not solicit the acceptance or rejection of the Plan by any creditor or equity holder prior to the transmission of the Disclosure Statement. Accordingly, it is my belief that the Debtors have complied with the applicable provisions of the Bankruptcy Code, including section 1125 as well as Bankruptcy Rules 3017 and 3018 and that the Plan meets the requirements of 11 U.S.C. 1129(a)(2).

### (2)     The Debtors Have Received the Requisite Accepting Votes Pursuant to Section 1126 of the Bankruptcy Code

49.     I have been informed that the Plan was accepted by each of Class 3 (OWB USA Affiliated Unsecured Claims), Class 4 (OWB USA Unaffiliated Trade Claims), Class 9 (OWB NA Affiliated Unsecured Claims), and Class 10 (OWB NA Unaffiliated Trade Claims).

50.     The Debtors complied with section 1126 of the Bankruptcy Code and, therefore, the Plan meets the requirement of section 1129(a)(2) of the Bankruptcy Code.

**D.      The Plan Was Proposed in Good Faith (Section 1129(a)(3))**

51.     I understand that only a Plan that has been proposed in good faith and not by any means forbidden by law may be confirmed. I understand that a plan is filed in "good faith" if it has a legitimate and honest purpose and presents a reasonable hope of success.

52.     The Debtors actively involved their creditor constituency in every stage of the Plan formulation process.  This participation is a sign of the Debtors' good faith in this case. The Plan is the product of those arms' length negotiations including numerous mediations conducted by the Honorable Alan H. Nevas (ret.) and constitutes an agreement among all such parties-in-interest including the Committee and ING Bank.

53.     It is my understanding that the Plan will result in greater creditor recoveries than would be realized if the Debtor's case were converted to a case under Chapter 7.

54.     The significant settlements achieved, the support of every constituency with an economic interest in the case, and the acceptance of the Plan by Holders of Claims who cast Ballots (in both amount and in number), reflect the overall fairness of the Plan and acknowledgement by the Debtors' creditors and interest holders that the Plan has been proposed in good faith and for proper purposes.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code have been satisfied in full.

**E.      Payments for Services and Expenses (Section 1129(a)(4))**

55.     I have been advised that any payment made or to be made by the Debtor for the services or costs and expenses in, or in connection with the Plan and incident to these Chapter 11 Cases are subject to approval by this Court.

56.     Accordingly, I believe the Plan fully complies with the requirements of

section 1129(a)(4) of the Bankruptcy Code.

**F.      The Plan Discloses All Required Information Regarding Post-   Confirmation
Management and Insiders (Section 1129(a)(5))**

57.     I undertand Debtor has disclosed: (i) the identity of those individuals who

will serve the Liquidating Trustee for each of the Liquidating Trusts; and (ii) that compensation

of the Liquidating Trustee will be at the standard hourly rate at the time the work is performed

(currently $775.00 per hour).

58.     Based on the foregoing disclosures, I believe that the Debtors have fully

satisfied the requirements of 11 U.S.C. § 1129(a)(5) as I understand them.

**G.      Rate Changes (Section 1129(a)(6))**

59.     It is my understanding that as the Debtors are liquidating that this section

is inapplicable.

**H.      The Plan Satisfies the "Best Interests" Test (Section 1129(a)(7))**

60.     It is my view that there is no question but that the Plan results in a greater

and faster recovery for any non-accepting creditors than they would receive in a hypothetical

liquidation.

61.     Absent the ING Bank Settlement – incorporated into and made part of the

Plan – there is no certainty as to the ultimate outcome of the Debtors' challenge to ING Bank's

purported liens or the recovery received by the Debtors' unsecured creditors after ING Bank's

purported section 503(b)(9) claims were allowed in full.

62.     Based on my review of the Liquidation Analysis and my review of the

Declaration of Scott Anchin submitted to this Court, it is my understanding that if the Debtors

were liquidated under Chapter 7 of the Bankruptcy Code, the Court would take the aggregate

dollar amount that was generated by the liquidation of the Debtors' assets (the "Liquidation

Value").  The Liquidation Value of the Debtors would consist of cash on hand, the Supply

Receivables receipts, amounts collected from vessel owners received in connection with the joint

payment instructions issued by the Debtors and ING Bank, and any amounts received following

the conclusion of maritime related litigation where the Debtors were considered contract

suppliers in the bunker supply transaction chain.

63.     The total net proceeds available from the sale of the substantially all of the

Debtors' assets and payment of allowed pre-petition and post-petition secured amounts would be

further reduced by (a) the costs, fees, and expenses of the liquidation, as well as other

administrative expenses of the Debtors' Chapter 7 case; (b) unpaid Administrative Claims; and

(c) Priority Claims and Priority Tax Claims.  The Debtors' costs of liquidation in Chapter 7

would include the compensation of trustees, their counsel, and other professionals retained by

such trustees, applicable taxes, litigation costs, claims arising from the operation of the Debtors

during the pendency of the Chapter 7 case, and all unpaid allowed Administrative Claims

incurred by the Debtors during the Chapter 11 case.  These Priority Claims and Priority Tax

Claims would be paid in full from the net liquidation proceeds before the balance would be made

available to pay Unsecured Claims.

64.     Apart from the inherent delays resulting from converting the Debtors'

cases to ones under Chapter 7 and as set forth in further detail in the Disclosure Statement and

the Anchin Declaration, the best interests test would be satisfied as to each dissenting member in

any of the Impaired Classes of Claims and Interests because a Chapter 7 liquidation of the

Debtors' assets would result in a substantial diminution in the anticipated value to be received by

the Holders of Claims and Equity Interests in comparison to their estimated recoveries under the

Plan.  The primary reason is that there is uncertainty in the final result of the debtors' litigation against ING Bank.

65.     Under the Debtors' Plan, ING Bank has agreed to accept treatment as a general unsecured creditor and subordinate approximately $17 million in Claims against the Debtors – which Claims it has been argued are potentially entitled to administrative expense priority pursuant to Sections 507 and 503(b)(9) of the Bankruptcy Code – to the Allowed Claims of the Debtors' other creditors.  In consenting to this treatment, ING Bank has provided the Debtors' creditors in Class 4 and Class 10 the opportunity to elect an enhanced liquidation preference (subject to certain other conditions) and for members of Classes 3, 4, 9, and 10 to receive their Pro Rata share of any remaining assets.  Additionally, without this resolution, the Debtors' adversary proceeding against ING Bank would go forward, resulting in not only additional professionals' fees but also without the guarantee of any recovery by creditors in Classes 4 and 10.

66.     In sum, the liquidation analysis demonstrates that the estimated value of proposed distributions to be made under the Plan will generate substantial benefits for all impaired holders of Claims (except those Holders affirmatively opting out of the receiving the liquidation preference) as compared to the estimated recoveries in Chapter 7.  Based upon the foregoing, it is my view that each Holder of a Claim or Equity Interest in an Impaired Class will receive or retain under the Plan property of a value, as of the Effective Date of the Plan, which is not less than the amount that such holder would receive in a hypothetical Chapter 7 liquidation.  As a result, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

67.     In light of the foregoing, I believe that the Plan satisfies the "best interests" test because any impaired, non-consenting members of Classes 4 and 10 would not

receive less under the Plan than they would in a Chapter 7 liquidation.

### I.   Acceptance by All Impaired Classes (Section 1129(a)(8))

68.   Based on my review of the Voting Declaration, all Impaired voting

Classes approved the Plan.

69.   The results of the certified vote tabulation included in the Voting

Declaration satisfy the requirement of section 1129(a)(8) of the Bankruptcy Code for all voting

Classes.  No tabulation results are reported for Deemed Accepting Classes or the Deemed

Rejecting Classes because, pursuant to the Solicitation Procedures Order, the votes of these

Classes were not solicited.  Instead, the Deemed Accepting Classes are deemed to have accepted

the Plan under the provisions of the Plan itself as well as the Solicitation Procedures Order.

70.   The Deemed Rejecting Classes are deemed to have rejected the Plan; the

Plan nevertheless may be confirmed over such nonacceptance pursuant to the "cramdown"

provisions of section 1129(b)(1) of the Bankruptcy Code.  As to these creditors, I understand that

the Plan satisfies the "cramdown" requirements of section 1129(b) of the Bankruptcy Code.

### J.   Plan Provides for the Payment of Priority Claims (Section 1129(a)(9))

71.   I understand that section 1129(a)(9) of the Bankruptcy Code contains a

number of requirements concerning the payment of priority claims and that the Plan satisfies

those requirements by providing for payment in full of Allowed Administrative Claims, Priority

Tax Claims and Priority Non-Tax Claims or by providing for such other treatment that the

Debtor and the Holders of those Claims have agreed upon.

### K.   Acceptance of at Least One Impaired Class (Section 1129(a)(10))

72.   I have been advised that if a plan has one or more impaired classes of

claims or interests that section 1129(a)(10) of the Bankruptcy Code requires that at least one

such class vote to accepted the plan, determined without including any acceptance of the plan by any insider.

73.     Based on my review of the Voting Report, the Debtors have satisfied this requirement.  For example, Class 4 is composed exclusively of parties who are not insiders to the Debtors.  In total, 11 Ballots, representing 68.75% of total Claims voting and 91.58% in value of Ballots voting in the Class, voted in favor of the Plan.  Thus, at least one impaired Class has voted to accept the Plan.  In addition, and as stated in the Voting Declaration, Classes 3, 9, and 10 have also accepted the Plan.

### L.     Feasibility (Section 1129(a)(11))

74.     I have been informed that a plan may be only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the plan, unless such liquidation or reorganization is proposed in the plan."

75.     The Plan is a liquidating plan and based on information provided to me by my the Debtors financial advisors, I am satisfied that there is sufficient cash available to make payments to Holders of all Allowed Claims.  I therefore submit that subject to the risks described in the Disclosure Statement, there is reasonable assurance that the Debtors will be able to satisfy all of its obligations under the Plan. The Plan therefore satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

### M.     Payment of Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12))

76.     To the best of my knowledge, all fees payable pursuant to 28 U.S.C. § 1930 have been paid or will be paid in Cash on or before the Effective Date.

### N.     Continuation of Retiree Benefits (Section 1129(a)(13))

77.     It is my understanding that section 1129(a)(13) of the Bankruptcy code does not apply to these cases because the Debtors have no benefit plans which qualify for treatment under that section.

**O.     Cramdown Under 1129(b)**

78.     I understand that the Bankruptcy Code provides that if certain requirements are met, a plan shall be confirmed notwithstanding that section 1129(a)(8) is not satisfied with respect to one or more classes. I have been informed that pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan should be confirmed notwithstanding the fact that the Deemed Rejecting Classes have not accepted the Plan because the Plan is fair and equitable with respect to, and does not unfairly discriminate against, the Deemed Rejecting Classes.

**1.     The Plan Does Not Discriminate Unfairly With Respect to the Holders of Claims and Equity Interests in the Deemed Rejecting Classes**

79.     I have been advised that the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes.  Classes 5 and 11 consist of subordinated claims pursuant to section 510(b) and 510(c) of the Bankruptcy Code and, as such, have different legal entitlements than the other classes of claims under the Plan.  More importantly, the Debtors had no Claims filed in their cases that fell into either Class 5 or Class 11.  I understand that Classes 6 and 12 consist of Equity Interests in the Debtors and, as such, have different legal entitlements than the other classes under the Plan.  The only equity holder of both OWB NA and OWB USA is O.W. Bunker Holding North America Inc., a fellow debtor in these proceedings who has consented to the disparate treatment.  Therefore, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes.

### 2.    The Plan is Fair and Equitable with Respect to Holders of Claims and Equity Interests in the Deemed Rejecting Classes

80.    It has been explained to me that a plan is not "fair and equitable" with respect to a non-accepting impaired unsecured class if a junior unsecured creditor or interest holder receives or retains property through a plan on account of its prepetition claim or interest. I understand that the Plan is "fair and equitable" with respect to Classes 5, 6, 11, and 12 because (i) no Classes or Claims senior to the Subordinated Claims or Equity Interests shall receive more than full payment on account of the Claims in such Classes; (ii) no holders of Claims junior to the Subordinated Claims or Equity Interests shall receive or retain any property under the Plan; and (iii) the Holders of Subordinated Claims or Equity Interests would not receive or retain any property on account of such Claims or Equity Interests in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. For these reasons, the Plan meets the fair and equitable requirements of section 1129(b) and should therefore be confirmed.

### P.    The Plan is the Sole Plan Considered for Confirmation (Section 1129(c))

81.    To my knowledge, there are no other plans that have been voted upon by Holders of Impaired Claims and Equity Interests in these Cases. Accordingly, I believe confirmation of the Plan will be in accordance with section 1129(c) of the Bankruptcy Code.

### Q.    No Governmental Unit Has Asserted that the Principal Purpose of the Plan is the Avoidance of Taxes (Section 1129(d)

82.    I do not know of any Governmental Unit that is a party in interest in these cases that has alleged at any time that the principal purpose of the Plan was the avoidance of taxes or application of section 5 of the Securities Act of 1933.

## III.     THE RELEASES AND EXCULPATIONS

83.     The Plan contains certain releases and exculpatory provisions.  I believe that each of these provisions are individually and collectively reasonable, integral to the Plan and resolution of the Debtors' cases, and necessary for the Plan's success.

84.     I understand that in addition to the standard Debtor releases in the Plan, the Debtors are seeking to provide releases to the Released Parties on behalf of non-debtor third parties (the "**Third Party Releases**").  I have been advised that Third Party Releases are permissible "when the provisions are important to a debtor's plan; where the claims are 'channeled' to a settlement fund, rather than extinguished; where the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; where the released party provides substantial consideration; where the plan otherwise provides for the full payment of the enjoined claims; or where the creditors consent."  I believe the Debtors' bankruptcy cases contain the necessary unique circumstances to justify granting the Third Party Releases.

### 1.     Creditors Consented to the Third Party Releases.

85.     I understand that the Ballot approved by the Solicitation Procedures Order provided those parties voting on whether to accept or reject the Plan with the ability to "opt-out" of providing Third Party Releases.  I understand that certain Holders of Class 4 and Class 10 Claims exercised their right to "opt-out" of the Third Party Releases.  With respect to those Holders of Class 4 and Class 10 Claims who did not "opt-out," I have been told that the releases are appropriate under applicable law.

86.     Furthermore, I believe that the Third Party Releases on behalf of the Released Parties with respect to Holders of Claims in (i) the Deemed Accepting Classes and (ii)

Classes 4 and 10 who did not cast a voting Ballot on the Plan are appropriate.

87.     Separately, this Court can grant the Third Party Releases on behalf of the Released Parties with respect to holders of Claims in (i) the Deemed Accepting Classes and (ii) Classes 4 and 10 who did not cast a voting ballot on the Plan.

88.     As required by the Solicitation Procedures Order, the Debtors mailed members of the Deemed Accepting Classes a Court-approved notice of non-voting status and notice of the confirmation hearing, which provided necessary information for filing objections to Plan confirmation and procedures for contesting the non-voting status of their claim.  No member of the Deemed Accepting Classes has objected to the Plan or the Third Party Releases found in the Plan.

89.     Finally, the Plan provides that Holders of Class 4 and Class 10 Claims who do not return a Ballot are deemed to have accepted the Plan, including the Third Party Releases.  In the case of non-voting Class 4 and Class 10 Holders, these claimants were served with the Voting Solicitation Package – including the Plan, a Ballot with a self-addressed return envelope, and a letter from Committee Counsel urging support of the Plan.  It is my view that these creditors were provided with every opportunity to vote and did not exercise their right to "opt-out" of the releases.  Furthermore, none of the non-voting Class 4 or Class 10 Holders has filed an objection to Plan confirmation.  Because the non-voting claimants in Class 4 and Class 10 were provided with every opportunity to vote on the Plan – including opting out of the Third Party Releases if they so elected – it is my view that the Court should construe their inaction as acceptance of the Third Party Releases found in the Plan.

**2.     The Third Party Releases are Important to the Plan.**

90.     The Third Party Releases are an important aspect of the Plan –which is

and was an integrated, interdependent deal negotiated between and among the Debtors, the

Committee, and ING Bank – and are, therefore, vital to the Plan.

91.     ING Bank's agreement to subordinate its significant section 503(b)(9)-

related administrative expenses is a lynchpin of the Plan, without which the Chapter 11 Cases

would devolve into endless litigation, the Plan would not be confirmable or feasible, and the

recoveries currently contemplated by the Plan would not exist.  It is my view that absent such

agreement, the ING Adversary Proceeding would have to be litigated through months and years

of discovery, motions, trial, appeals and expense.  The Plan avoids all of that and achieves a 25%

liquidation preference for unsecured creditors in the OWB NA case and a 40% preference in the

OWB USA case.  The Third Party Releases are essential and critical to the success of the Plan,

which was and is an integrated, interdependent deal.  Without the Third Party Releases, there

would be no agreement with ING Bank to subordinate its administrative expenses and the

Debtors' creditors would not receive any recovery under the Plan (or a Chapter 7 liquidation).

**3.      The Released Parties Provided Substantial Consideration in Exchange
for the Third Party Releases**

92.     As previously discussed, the Debtors' settlement of pending litigation

between ING Bank and the Debtors is one of the primary reasons why one of the reasons the

Debtors are preparing for confirmation of the Plan.  ING Bank has provided substantial

consideration by agreeing to subordinate significant administrative expenses in order to provide a

meaningful recovery for the Debtors' electing unsecured creditors.

93.     Adrian Tolson and I also provided significant contributions to the Debtors

during the Debtors' bankruptcy cases.  We each chose to stay with the Debtors when they needed

us – providing significant insight into the Debtors' pre-petition bunker supply transactions,

reviewing transaction documents in connection with the pending maritime-related interpleader

proceedings, pursuing vessel arrest complaints, providing evidence and testimony when necessary, and overseeing the Debtors' wind-down.

94.     Personally I have been tasked with not only on Plan-related confirmation issues, but on matters currently proceeding in the Southern District of New York, the Eastern District of Louisiana, the Southern District of Texas, and the Central District of California.  The work performed by Mr. Tolson and me was critical to reaching this stage of the Chapter 11 Cases.

95.     I understand that the Mr. Tolson and I may be called on in the future, as the Plan contemplates that the Liquidating Trusts will collect their remaining receivables (and fund distributions) through pursuing the interpleader matters, vessel arrests and other collection activities and litigation.  This will only succeed with the active help and involvement of the only two knowledgeable personnel still available to the Liquidating Trust.

**B.      Exculpations**

96.     I understand the Plan also seeks approval of an exculpation provision benefitting those parties that were instrumental to the Debtors' efforts during its Chapter 11 Cases.

97.     I have been informed that the provision is consistent with public policy and section 1125(e) of the Bankruptcy Code (no liability for good faith actions in connection with plan solicitation or issuance of securities under a plan) and believe the exculpations should be approved.

**IV.     OBJECTIONS**

98.     The Debtors received only two objections to confirmation of the Plan: the Martin Energy Objection and the UST Objection.  The Debtors have responded to the UST

Objection.  The Martin Energy Objection has been resolved through the addition of the following language to the proposed order to confirm the Plan.  No other objections were filed.

## V.    TECHNICAL AMENDMENTS TO THE PLAN

I know that since the time the Plan was distributed for vote, there have been some technical amendments to the Plan:

(a)    Modify Article IX.8 of the Plan [Docket No. 1171 at p. 42] to eliminate the reference to section 553 of the Bankruptcy Code.  The corrected section would provide:

8. Setoffs.  A Liquidating Trust may, but shall not be required to, exercise any right of setoff against any Claim pursuant to applicable provisions of the Bankruptcy Code (including, without limitation, section 558 of the Bankruptcy Code) or other applicable law; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claim that a Liquidating Trust may have against the Holder of such Claim.   The Debtors' setoff rights are specifically preserved to the fullest extent possible under the Bankruptcy Code and other applicable law.

(b)    Modify Article 2.5 OWB NA Liquidating Trust Agreement [Docket No. 1166, Ex. 1] to substitute "OWB NA" for the reference to "OWB USA" in the last sentence.

It is my view that the aforementioned changes do not materially affect the treatment of any Holders of Claims or Equity Interests and can be approved without the resolicitation of votes.

## VI.    CONCLUSION

Based on the foregoing, I believe that the Plan satisfies the requirements for confirmation and is in the bests interests of the Debtors, the Holders of Claims and Equity Interests, and all other parties-in-interest, and should be approved in all respects.

I declare this under penalty of perjury that the foregoing is true and correct.

Dated:  December 9, 2015                    /s/       *Hans Staal Jonassen*
                                            Hans Staal Jonassen
                                            Authorized Officer