UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER   11 |
| | ) | |
| O.W. BUNKER HOLDING NORTH | ) | CASE No.   14-51720 (JAM) |
| AMERICA INC., *et al.*, | ) | |
| | ) | |
| DEBTORS. | ) | ECF Nos.   1532 and 1539 |
| | ) | |

### APPEARANCES

J. Stephen Simms, Esq.
Simms Showers, LLP
201 International Circle
Baltimore, Maryland 21030

Michael R. Enright, Esq.
Patrick M. Birney, Esq.
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103

Natalie D. Ramsey, Esq.
Davis Lee Wright, Esq.
Robinson & Cole LLP
1000 N. West Street
Wilmington, DE 19801

Attorney for Dolphin Marine Fuels LLC

Attorneys for the O.W. Bunker USA Inc.
Liquidating Trust and O.W. Bunker USA

### MEMORANDUM OF DECISION GRANTING DOLPHIN'S MOTION FOR SUMMARY JUDGMENT AND DENYING OWB USA TRUST'S MOTION FOR SUMMARY JUDGMENT

## I.    Introduction

On November 13, 2014, O.W. Bunker Holding North America Inc. ("OWB Holding"),

O.W. Bunker North America Inc. ("OWB NA"), and O.W. Bunker USA, Inc.[1] ("OWB USA"),

filed petitions for relief under Chapter 11 of the Bankruptcy Code.  At the time of the filing of

the petitions, OWB NA and OWB USA conducted the United States operations of an

---

[1] OWB USA's corporate parent is O.W. Bunker A/S, a corporation organized under the laws of the Denmark. Declaration of Hamish Allanson in Support of the OWB USA Motion for Summary Judgment ¶ 4 (the "Allanson Decl.," ECF No. 1536).

international group of global marine fuel companies (collectively, the "OW Bunker Group"), which provided fuel oil (the "bunkers" or "bunker fuel"), to marine vessels. *See* Debtors' Joint Disclosure Statement With Respect to Debtors' Liquidation Plans (ECF No. 1018).

On December 15, 2015, the Court entered an Order Confirming the Debtors' First Modified Liquidation Plans (ECF No. 1279), and Kelly Beaudin Stapleton was appointed as the Liquidating Trustee of the O.W. Bunker North America Inc. Liquidating Trust (the "OWB USA Trust"). On August 6, 2015, Dolphin Marine Fuels, LLC ("Dolphin"), filed a Request for Allowance and Reimbursement of 11 U.S.C. § 503(b)(9) Administrative Expense (the "Dolphin 503(b)(9) Request," ECF No. 775), asserting an administrative expense claim of $87,165.30[2] against OWB USA pursuant to 11 U.S.C. § 503(b)(9).[3] On August 20, 2015, the Debtors objected to Dolphin's 503(b)(9) Request (the "OWB USA Objection to Dolphin," ECF No. 827).

Dolphin's administrative expense claim is the subject of two motions for summary judgment: the first filed by Dolphin[4] and the second filed by OWB USA Trust.[5] Dolphin claims that it is entitled, as a matter of law, to an allowed administrative expense claim for delivery of bunker fuel to the marine vessel defined below (the "Vessel"). The OWB USA Trust objects to Dolphin's assertion, and claims, as a matter of law, that the Debtors did not receive the bunker fuel and therefore Dolphin's administrative expense claim should be recharacterized as a general unsecured claim. Dolphin and the OWB USA Trust submitted an extensive joint stipulation of facts with respect to the Motions for Summary Judgment.[6] Dolphin and the OWB USA Trust

---

[2] The administrative expense claim amount was later reduced to $82,165.30 by agreement. *See* Dolphin's Amended Motion for Summary Judgment, 2 n.3 (ECF No. 1532).
[3] Unless otherwise indicated, all references to the "Bankruptcy Code," "section," or "§" refer to Title 11 of the United States Code, 11 U.S.C. § *et seq.,* as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8 ("BAPCPA").
[4] Dolphin's Amended Motion for Summary Judgment is referred to as the "Dolphin MSJ," (ECF No. 1532).
[5] The OWB USA Trust's motion for summary judgment is referred to as the "OWB USA MSJ," (ECF No. 1539).
[6] *See* "Dolphin-OWB USA Stipulation," (ECF No. 1097).

2

assert that the only disputed issue to be decided is whether the bunker fuel was "received by" OWB USA.

The purchase and delivery of the bunker fuel was accomplished through multiple parties and governed by several contracts.  When the Vessel ordered a bunker fuel, OWB USA ultimately fulfilled that order by contracting with Dolphin to deliver the bunker fuel to the Vessel.  In the contract between the OW Bunker Group and the Vessel, the OW Bunker Group was the "Seller" and the Vessel was the "Buyer."[7]   In the contract between Dolphin and OWB USA, Dolphin was the "Seller" and OWB USA was the "Buyer."[8]

The parties have not presented, and the Court has not found, controlling case law specifically addressing the issue of "receipt" by a debtor in circumstances such as those presented in this case.  The Motions for Summary Judgment focus on the issues of transfer of title, risk of loss, and delivery of the bunker fuel at the Vessel flange to determine whether OWB USA "received" the bunker fuel.  However, addressing those issues does not answer the question of whether Dolphin is entitled to an administrative expense claim.  The Court must instead focus on the case law addressing the definition of "receipt" under section 503(b)(9) and the contract between the OW Bunker Group and the Vessel in order to determine whether OWB USA "received" the bunker fuel.

---

[7] The OW Bunker Group Terms and Conditions of sale for Marine Bunkers, Edition 2013 (the "OW Bunker Group Terms"), applied to the contract between the OW Bunker Group and the entity purchasing bunker fuel from the OW Bunker Group.  *Id.* at Exhibit D.  The parties define the OW Bunker Group Terms as the OW Terms.
[8] The Dolphin Marine Fuels Inc. Marine Fuel Contract (the "Dolphin Terms"), is attached to the Dolphin-OWB USA Stipulation as Exhibit B.

## II.    Undisputed Facts

### The OW Bunker Group Transaction with the Vessel and the Dolphin Transaction with the Vessel[9]

The parties agree that Dolphin delivered bunker fuel to one vessel pursuant to its contract with OWB USA.  Dolphin and OWB USA also agree that the bunker fuel supplied by Dolphin constituted "goods" within the meaning of § 503(b)(9).  Dolphin and OWB USA further agree that the delivery of bunker fuel occurred within the twenty day period before the petition date and that OWB USA never had physical possession of the bunker fuel that is the subject of Dolphin's alleged administrative expense claim.  The facts surrounding the delivery of the bunker fuel to the Vessel, along with the amount of Dolphin's alleged administrative expense claim, are detailed below.

### The "Shengking" – Alleged claim for $82,165.30

On or about October 25, 2014, China Navigation Co. PTE Ltd. ("China Navigation"), initially ordered bunker fuel from O.W. Bunker Far East (S) Pte Ltd ("OW Singapore"), which then ordered from OWB USA.[10]  On October 17, 2014, OWB USA entered into a contract pursuant to which Dolphin agreed to supply bunker fuel to the Shengking.[11]  On October 26, 2014, Dolphin delivered the bunker fuel to the Shengking.[12]  On October 27, 2014, Dolphin sent an invoice to OWB USA in the ordinary course of their businesses.[13]

## III.    Discussion

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) is made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056.  Rule 56 directs that "[t]he court shall grant summary

---

[9] *See generally*, Dolphin-OWB USA Stipulation.
[10] *Id.* at ¶¶ 4-6; Ex. D.
[11] *Id.* at ¶ 1 *see id.* at Exs. A-C.  The contract between Dolphin and OWB USA was governed by the Dolphin Terms.
[12] *Id.* at ¶ 8; *see id.* at Ex. E.  Dolphin hired Westoil Marine Services Inc. to physically deliver the bunker from Dolphin's storage facilities. *Id.* at ¶ 9.
[13] *Id.* at ¶ 10; *see id.* at Ex. F.

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "Upon consideration of a motion for summary judgment, 'the judge's function . . . is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Parris v. Delaney (In re Delaney)*, 504 B.R. 738, 746 (Bankr. D. Conn. 2014) (quoting *Anderson*, 477 U.S. at 249). "[T]he court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Mex. Constr. & Paving v. Thompson (In re Thompson)*, 511 B.R. 20, 24 (Bankr. D. Conn. 2014) (quoting *Flaherty v. Lang*, 199 F.3d 607, 615 (2d Cir. 1999)).

At the summary judgment stage, the moving party must show there are no material issues of fact, and the court must consider all facts in the light most favorable to the non-moving party when making this determination. *Conn. Ironworkers Emp'rs Ass'n v. New England Reg'l Council of Carpenters*, 869 F.3d 92, 98–99 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1547 (2018) (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456, (1992); *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48 (2d Cir. 2015)). Once the moving party has met its burden, the "party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Official Comm. of Unsecured Creditors of Affinity Health Care Mgmt., Inc. v. Wellner (In re Affinity Health Care Mgmt., Inc.)*, 499 B.R. 246, 251 (Bankr. D. Conn. 2013) (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)).

## B.   "Received by the Debtor" under 11 U.S.C. § 503(b)(9)

An administrative expense claim arises out of a transaction between a creditor and a debtor, and "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor[] in the operation of the business." *Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (internal quotation marks omitted).   "Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed," and the party requesting an administrative expense has the burden of proving its entitlement to it.   *Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 479 F.3d 167, 172 (2d Cir. 2007) (internal quotation marks omitted).   A review of the existing case law, including the law relied upon by the parties, demonstrates that determining whether the bunker fuel was "received by the debtor" is complicated.   As the parties acknowledge, the term "received" is not defined in the Bankruptcy Code.   Courts have looked to the Uniform Commercial Code (the "UCC"), and the interpretation of "receipt" with respect to reclamation rights recognized in section 546(c) of the Bankruptcy Code, to define "receipt" under section 503(b)(9).   Therefore, to determine whether OWB USA "received" the goods as a matter of law, several provisions of the UCC, case law concerning the meaning of "received by the debtor" in section 503(b)(9), and the contract between the OW Bunker Group and the Vessel must be analyzed.

### 1.   The Uniform Commercial Code

The UCC defines "receipt" with respect to goods as "taking physical possession of them."   UCC § 2-103(1)(c).   Despite what appears to be a clear definition of "receipt," courts

have been asked to address what constitutes "possession."  Comment 2 to § 2-103 expands on the definition of "receipt" by explaining that

> **'Receipt' must be distinguished from delivery** particularly in regard to the problems arising out of shipment of goods, whether or not the contract calls for making delivery by way of documents of title, since the seller may frequently fulfill his obligations to 'deliver' even though the buyer may never 'receive' the goods. Delivery with respect to documents of title is defined in Article 1 and requires transfer of physical delivery. . . .  Otherwise the many divergent incidents of delivery are handled incident by incident.

*Id.* at cmt. 2 (emphasis added).

UCC § 2-702 describes a seller's remedies upon discovering a buyer's insolvency.  The seller's remedies include refusing delivery except for cash payment or, when the seller discovers the buyer received the goods on credit while insolvent, the seller can reclaim the goods upon demand made within ten days of receipt.  Complimenting UCC § 2-702 is § 2-705, which provides four circumstances where a seller is no longer able to stop goods in transit after the buyer has taken possession, and which expand the definition of "receipt."  *See also Montello Oil Corp. v. Marin Motor Oil, Inc. (In re Marin Motor Oil, Inc.)*, 740 F.2d 220, 223-26 (3d Cir. 1984) (hereinafter "*Marin*").  Two of the circumstances where a seller no longer has a right or the ability to stop the shipment of goods in transit are relevant to the discussion here:

> (a) receipt of the goods by the buyer; or
> (b) acknowledgment to the buyer by any bailee of the goods except a carrier that the bailee holds the goods for the buyer . . . .

UCC § 2-705.  Sub-section (a) is the only circumstance that relies on actual, physical possession, while sub-section (b) provides a circumstance where a seller can no longer stop goods in transit because the buyer has constructive possession.  *See id.*  The Official Comment to § 2-705 expands the definition of "receipt by the buyer," to include,

> receipt by the buyer's designated representative, the sub-purchaser, when shipment is made direct to him and the buyer himself never receives the goods.  It is entirely

proper under this Article that the seller, by making such direct shipment to the sub-purchaser, be regarded as acquiescing in the latter's purchase and is thus barred from stoppage of the goods as against him.  As between the buyer and the seller, the latter's right to stop the goods at any time until they reach the place of final delivery is recognized by this section.

*Id.* at cmt. 2.  These provisions of the UCC permit "receipt" by a buyer that does not require physical possession.  *See* UCC § 2-705(b).  According to the UCC, although receipt means "taking physical possession," it also allows the person taking physical possession to be either the buyer or the buyer's bailee, designated representative, or sub-purchaser.  UCC § 2-705 at cmt. 2.

##   2.  **Case Law**

Because "receipt" or "received" is not defined in the Bankruptcy Code, the Court relies not only on the provisions of the UCC, but also on case law in which other courts have interpreted the meaning of these terms under section 503(b)(9).  Several courts have acknowledged that the UCC provides that "receipt" requires possession, and there are two kinds of possession: (i) actual, physical possession; and (ii) constructive possession.

"Possession may be actual or constructive, and occurs when the seller can no longer stop delivery and is left only with the remedy of reclamation."  *In re ADI Liquidation, Inc.*, 572 B.R. 543, 548 (Bankr. D. Del. 2017); *see also In re World Imports, Ltd.*, 862 F.3d 338, 346 (3d Cir. 2017) ("receipt as used in 11 U.S.C. § 503(b)(9) requires physical possession by the buyer or his agent."); *Marin*, 740 F.2d at 224-25 (holding that "receipt" under 11 U.S.C. § 546(c) has the same meaning as "receipt" in the U.C.C.); *In re Momenta, Inc.*, 455 B.R. 353, 359 (Bankr. D.N.H. 2011) (hereinafter "*Momenta I*") (holding "the term 'received' in § 546(c) is the equivalent of 'received' in the U.C.C., and the term 'received' in § 503(b)(9) shall be interpreted identically."); *Ningbo Chenglu Paper Prod. Mfg. Co. v. Momenta, Inc.*, No. 11-CV-479-SM, 2012 WL 3765171, at *6 (D.N.H. Aug. 29, 2012) (hereinafter "*Momenta II*") ("[T]he phrase

'received by the debtor' as used in Section 503(b)(9) means: possessed by the debtor, either actually or constructively. . . . [and] under Section 503(b)(9), delivery to, or possession by, a debtor's customer under a drop-shipment arrangement does not constitute constructive possession by the debtor for Section 503(b)(9) purposes.").

The case law on "receipt" has evolved over time, and decisions relevant to this case have been issued before and after the enactment of section 503(b)(9).  The facts and holdings of the relevant cases are addressed in detail below.

### *Marin*

The United States Court of Appeals for the Third Circuit decision in *Marin* began the evolution of the definition of "receipt" and "received" under specific sections of the Bankruptcy Code.[14]  *See* 740 F.2d 220.  Although *Marin* predates BAPCPA and section 503(b)(9), it has been relied upon by several courts analyzing administrative expense claims under section 503(b)(9).  In *Marin*, the court addressed the meaning of "receipt" in the context of section 546(c), which acknowledges the right of a seller to reclaim goods under certain circumstances. *See id*.

The debtor, Marin, had arranged for a commercial barge operated by a common carrier to pick up the gasoline it was purchasing from the creditor, transport the gasoline to a terminal where Marin had storage rights, and unload the gasoline into the storage facility.  *Id.* at 222.  The creditor was not involved in transporting the gasoline.  *Id.*  The *Marin* court discussed the

---

[14] *Marin* is distinguished by *In re Best Buy Drugs Inc.*, 89 B.R. 997, 997-98 (Bankr. S.D. Fla 1988) (the issue was "what definition of insolvency applies in order for a plaintiff to succeed in a reclamation proceeding under 11 U.S.C. § 546(c)," and the court found the plaintiff's reliance on *Marin* mistaken because the definition of insolvency was not discussed) and *Old Republic Ins. Co. v. United States*, 625 F. Supp 983, 985 (Ct. Int'l Trade 1986) (a surety filed an action contesting the United States Customs Services' classification of merchandise that entered the United States, and the court found that *Marin*, along with another case the defendant cited in support of its contention "that a bald demand for payment is sufficient in the absence of a requirement that a demand be particularized" was inapposite because the cases did not deal with analogous situations).

Bankruptcy Code's adoption of "the seller's right of reclamation created by section 2-702 of the [U.C.C.], which enables a seller to reclaim its goods upon demand made within ten days after receipt of the goods by the buyer." *Id.* at 221 (internal quotation marks omitted). The court addressed two questions, only one of which is relevant to this discussion: whether Marin received the goods in question in order to start the ten-day period running for the purpose of reclamation. *Id.*

The court delved into the legislative history of section 546(c) to determine whether and to what extent the right to reclamation was preempted by the Bankruptcy Code. The court found that the drafters of the Bankruptcy Code "essentially [] adopt[ed] 2-702(2) as part of the federal bankruptcy law. . . ." *Id.* at 223. The court then turned to the question of what constituted "receipt" of goods. Marin argued that it took possession of the goods when they were loaded onto the common carrier because that was when title and risk of loss passed to it, which put receipt of the goods outside of the ten-day period for reclamation. *Id.* at 225. The court found that Marin's argument ignored "the fact that the U.C.C. does not rely on the concept of "title for the purposes of establishing rights of buyers and sellers" and ignored "U.C.C. § 2-705, which views goods given by a seller to a common carrier . . . as being in the possession of the common carrier not the buyer, and gives the seller the right to stop delivery of the goods upon discovery of the buyer's insolvency." *Id.*

The court then noted that the right to stop goods in transit applies regardless of who has "title," and the separate right of reclamation does not take effect until the buyer "receives the goods." *Id.* While the gasoline was in the physical possession of the common carrier, the court held that Marin did not have possession of it – physical or otherwise, and the creditor's remedy upon discovering Marin was insolvent would have been to order the common carrier to stop

10

delivery of the goods. *Id.* However, "[o]nce the gasoline was delivered to Marin's bailee, i.e., [the storage facility], Marin had constructive possession under § 2-705(2) and [the creditor's] right to stop delivery terminated and its right to reclaim the goods under U.C.C. § 2-702(2) arose." *Id.* at 225-26. The *Marin* discussion of when receipt occurs is relevant here because section 503(b)(9) provides an alternative remedy to reclamation under section 546(c) when, for instance, reclamation is impossible.

### *In re Circuit City Stores, Inc.*

*In re Circuit City Stores, Inc.*, 432 B.R. 225 (Bankr. E.D. Va. 2010) (hereinafter "*Circuit City II*") was one of the first post-BAPCPA cases in which a court was asked to interpret "receipt" under section 503(b)(9). Circuit City Stores, Inc. and its related entities (collectively, "Circuit City"), was a national retailer of consumer electronics. *Id.* at 227. Circuit City sold goods in its stores that were obtained on consignment from third party suppliers. *Id.* One supplier, Panasonic Corporation of North America ("Panasonic"), sold goods on consignment to Circuit City before Circuit City filed the jointly administered Chapter 11 cases. *Id.* Circuit City came into physical possession of the goods more than twenty days before the commencement of the Chapter 11 cases. *Id.* Although Circuit City was in physical possession of the goods more than 20 days before their cases were commenced, Panasonic filed a request for an administrative expense claim under section 503(b)(9), arguing that the goods should be deemed to be received by Circuit City on the date that title to the goods passed from Panasonic to Circuit City. *Id.* at 226. Circuit City objected to Panasonic's claim and argued that the goods were received on the date Circuit City took physical possession of them. *Id.*

In analyzing the term "received," the court determined that is was appropriate to "adopt and apply a federal definition for the term 'received' for purposes of section 503(b)(9) . . . ." *Id.*

at 228.  The court then noted that while the UCC does not define "received," it does define "receipt" of goods as "taking physical possession of them."  *Id*.  The court determined that because "receipt" and "received" are similar words that concern related issues, they should be treated as functionally identical.  *Id.* at 229; *see also In re Circuit City Stores, Inc.*, 416 B.R. 531, 536 (Bankr. E.D. Va. 2009) (hereinafter "*Circuit City I*") (concluding that the term "goods" in § 503(b)(9) should have the same meaning as "goods" as defined in § 546(c)).  The court held that, for purposes of section 503(b)(9), "received" means having physical possession of the goods, and because Circuit City was in physical possession of the goods more than twenty days before the commencement of the Chapter 11 cases, Panasonic was not entitled to an administrative expense claim.  *Circuit City II*, 432 B.R. at 230.

### *Momenta I*

*Momenta I* was another case decided after BAPCPA to address "receipt" in connection with a section 503(b)(9) claim.  *See* 455 B.R. 353.  The bankruptcy court was tasked with determining "whether [the creditor, Ningbo] should be allowed an administrative expense claim pursuant to § 503(b)(9) because the Debtor received goods from Ningbo within twenty days of the bankruptcy petition."  455 B.R. at 355.  Ningbo had delivered goods in six orders to the debtor or its customers in the twenty days prior to the bankruptcy petition.  *Id.* at 355-56.  Two of the orders were delivered to the debtor's warehouse, but there was no record of what happened to the four other orders, such as whether they were placed in a warehouse, held by a customs agent, delivered to a common carrier, or held by a bailee (the court classified these four orders as the "Drop Shipments").  *Id.* at 356.

The *Momenta I* court set out to determine whether the Drop Shipments were "received by the debtor" in the context of section 503(b)(9), and relied on its connection to section 546(c) to

make that determination. *Id.* The court found the direct link between section 503(b)(9) and section 546(c) informative because section 503(b)(9) serves as an alternative remedy to reclamation for a seller, and case law prior to the enactment of section 503(b)(9) granted sellers administrative expense claims as an alternative to the right of reclamation. *Id.* at 357. The court noted that section 546(c) incorporated Article 2's right of reclamation when the Bankruptcy Code drafters "essentially adopted U.C.C. § 2-702(2) by enacting § 546(c), but with modifications." *Id.* at 358. In defining "received," the *Momenta I* court agreed with the analysis in *Circuit City II* that "received" and "receipt" as defined in the UCC "are similar words, concern related issues, and should be treated as functional equivalents and interpreted identically." *Momenta I*, 455 B.R. at 358.

The *Momenta I* court then addressed the issue of whether receipt by the debtor can only be accomplished when the debtor is in physical possession of the goods. *Id.* at 359. Like OWB USA, the debtor in *Momenta I* argued that because it never took physical possession of the Drop Shipments, the goods were never "received by the debtor." *Id.* The court analyzed the relationship between UCC sections 2-702 and 2-705 and the Third Circuit's reasoning in *Marin*, and held that "[a] seller must be entitled to an administrative expense claim where a debtor received goods, by having either physical possession or constructive possession as specified in U.C.C. § 2-705(2) . . . ." *Id.* at 360. *Momenta I* therefore found that under the UCC, possession may be physical possession or constructive possession. *Id.* Although the court ultimately held that the record failed to establish whether the debtor had any physical or constructive possession of the Drop Shipments, *id.* at 361, the court stated that constructive possession of goods could be deemed to be "receipt by the debtor" for purposes of § 503(b)(9). *See id.* at 359.

### *Momenta II*

The United States District Court for the District of New Hampshire affirmed *Momenta I* in *Momenta II.* 2012 WL 3765171 at *7. The district court agreed with the bankruptcy court that "changes made to the Bankruptcy Code in 2005 suggest an intent to create a priority administrative expense as a supplemental remedy *for reclamation sellers,* and not . . . a priority remedy for all sellers who deliver goods pursuant to a contract with the debtor and within twenty days preceding bankruptcy." *Id.* (emphasis in original). In its holding, the district court stated that the "bankruptcy court correctly concluded that Sections 503(b)(9) and 546 are related statutory provisions enacted for the benefit of reclamation sellers." *Id.* at *6. It also affirmed the bankruptcy court's determination that the word "received" in sections 503(b)(9) and 546 mean the same thing. *Id.*

### *In re ADI Liquidation, Inc.*

In the *ADI Liquidation* case, the United States Bankruptcy Court for the District of Delaware was asked to determine whether the debtor constructively "received" goods under section 503(b)(9) when the goods were delivered to a third party. 572 B.R. 543. The debtor in *ADI Liquidation* distributed food and retail services to buyers who ordered directly from the manufacturer but paid the debtor for the goods and services. *Id.* The manufacturer delivered the goods directly to the buyers, and the debtor remitted payment to the manufacturer after deducting a percentage of the invoice amount charged to the buyers. *Id.*

In assessing whether the goods were "received by the debtor" under section 503(b)(9), the *ADI Liquidation* court asked, "[s]hould the definition of constructive receipt be expanded to include deliveries to non-bailee third parties when the debtor is substantially involved in facilitating transactions between a third party and the vendor?" *Id.* at 549. The court held that it "should not," noting that other courts "have held that an arrangement whereby goods are

14

delivered directly to a non-debtor, ***non-bailee***, third party does not give rise to constructive possession and, therefore, there can be no valid administrative priority claim under section 503(b)(9)." *Id.* (emphasis added).

### *In re World Imports, Ltd.*

The *World Imports* was decoded a few weeks after *ADI Liquidation*. In *World Imports*, the United States Court of Appeals for the Third Circuit relied on its 1984 decision in *Marin* and held that "receipt" in section 503(b)(9) requires physical possession of the goods by buyer or its agent. *See* 862 F.3d 338 at 346. The creditors in *World Imports* shipped goods via common carrier from China to the debtor in the United States. *Id.* at 340. The parties agreed that the goods were shipped and in the physical possession of the common carrier more than twenty days before the bankruptcy filing. *Id*. at 341. The parties also agreed that the debtor took physical possession of the goods within the twenty day period. *Id.* The parties disagreed over whether the debtor "received" the goods under section 503(b)(9) when the goods were placed on the common carrier or when the goods were delivered to the debtor within the twenty day period. *Id.* The bankruptcy and district courts held that the common carrier was an agent of the debtor and therefore the debtor constructively received the goods when the common carrier took physical possession of the goods. *Id.* Because the common carrier took physical possession of the goods more than twenty days before the bankruptcy case was filed, the bankruptcy and district courts held that the creditors were not entitled to an administrative expense claim under section 503(b)(9). *See id.*

In overruling the bankruptcy and district courts, the Third Circuit held that once the seller delivered goods to the common carrier, the "receipt of the goods by a common carrier is not deemed constructive possession by a buyer, but rather is deemed to be possession by the

15

common carrier." *Id.* at 346 (internal quotation marks omitted). The court confirmed its finding in *Marin* that "delivery and receipt of goods can occur at different times," while also stating that the "U.C.C. does not rely on the concept of 'title' for purposes of establishing the rights of buyers and sellers under the Code." *Id.* at 345. Based on this analysis, the Third Circuit ultimately held that "received" in section 503(b)(9), like the *Marin* definition of "receipt" in section 546(c), requires physical possession by the buyer or his agent. *Id.* at 345-46.

### *In re SRC Liquidation, LLC*

Three days after the *World Imports* decision, the United States Bankruptcy Court for the District of Delaware addressed the issue of receipt under section 503(b)(9). *See In re SRC Liquidation, LLC*, 573 B.R. 537 (Bankr. D. Del. 2017). In *SRC Liquidation*, the parties stipulated that the creditor delivered the goods in question to UPS for shipping to a third party customer of the debtor via the debtor's account during the twenty day period before the debtor's bankruptcy case was filed. *Id.* at 540. However, the parties disagreed as to whether those goods when delivered to the customer were "received by the debtor." *Id.* The court held that a common carrier like UPS does not qualify as an agent, and goods that are shipped directly to the debtor's customer by its supplier using a common carrier were never physically possessed by the debtor or its agent. *Id.* at 542 (citing *World Imports*, 862 F.3d at 345). Based upon the holding that common carrier was not an agent of the debtor, the court denied the creditor's request for an administrative expense claim. *See id.*

### 3.  **Analysis**

The cases discussed above did not directly address the issue of "received" under section 503(b)(9) when a buyer's bailee is in physical possession of the goods. However, the decisions are relevant to determine whether OWB USA "received the goods" in this case.

The *Marin* court's definition of "receipt" in section 546(c), its determination that section 546(c)'s adoption of UCC § 2-702(2) preserves the right of reclamation, and its finding that a bailee of the debtor taking possession of goods gives rise to the right of reclamation are applicable to the issues in this case. *See* 740 F.2d at 225-26. The reasoning in *Marin* and the relationship between sections 546 and 503(b)(9) can be applied to the situation here: A bailee of the debtor/buyer (the Vessel) had physical possession of the goods (the bunker fuel) and was entitled to use the goods for propulsion of the Vessel (which the Vessel did). The seller of the goods (Dolphin) was no longer able to reclaim the goods because each Vessel used the bunker fuel for propulsion. As noted by several courts, the situation presented in this case is what the drafters of BAPCPA envisioned when they amended section 546(c)(2) and enacted section 503(b)(9) to enhance certain type of reclamation claims. *See, e.g.*, *Circuit City I*, 416 B.R. at 536; *Circuit City II*, 432 B.R. at 229.

Furthermore, post-BAPCPA courts have looked to *Marin* to conclude that "receipt" means the same thing in both sections 503(b)(9) and 546(c). *See World Imports*, 862 F.3d at 342-33; *Momenta II*, 2012 WL 3765171 at *5-6; *SRC Liquidation*, 573 B.R. at 541; *ADI Liquidation*, 572 B.R. at 548; *Momenta I*, 455 B.R. at 358; *Circuit City II*, 432 B.R. at 229; *Circuit City I*, 416 B.R. at 536-37. In addition, in *Momenta I*, the court found that the term "receives" includes the three forms of constructive possession set forth in U.C.C. §2-705(2). 455 B.R. at 359-60. In the most recent cases that address the issue of receipt, *ADI Liquidation and World Imports*, the courts acknowledged that constructive possession by the debtor occurs when the goods are delivered to a bailee of the debtor. *ADI Liquidation*, 572 B.R. at 549; *World Imports*, 862 F.3d at 345.

17

These cases answer the first part of the question raised by the parties; "received by the debtor" in section 503(b)(9) is either: (i) physical possession of the goods by the debtor; or (ii) constructive possession, when a bailee or an agent of the debtor physically possesses the goods. The second part of the question as to whether goods were "received by the debtor" turns on the Vessel's contractual relationship with the OW Bunker Group.  In accordance with the OW Bunker Group Terms, the Vessel possessed the bunkers solely as a bailee of the OW Bunker Group, which includes OWB USA.  Because the relationship between the OW Bunker Group and the Vessel cannot be ignored, Dolphin's administrative expense claim is allowed.

### **Dolphin's claim is an allowed administrative expense claim because the Vessel is a bailee of OWB USA**

The OW Bunker Group Terms applied to the agreement between the OW Bunker Group and the Vessel purchasing bunker fuel from the OW Bunker Group (including an affiliated O.W. Bunker entity).[15]  The OW Bunker Group Terms define "Seller" as "OWB [the International O.W. Bunker Group]; any office, branch office, affiliate or associate of the OWB Group; being the legal entity within the OWB Group, whose name is included in the Order Confirmation sent to the Buyer."  OW Bunker Group Terms ¶ B.1.  The definition of Seller includes OWB USA, as well as OW Singapore.

The OW Bunker Group Terms define "Buyer" as:

> the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made. . . .

*Id.*  The definition of "Buyer" includes the Vessel described above.

The OW Bunker Group Terms further state:

---

[15] Dolphin-OWB USA Stipulation, Exhibit D, "OW Bunker Group Terms."

> Until full payment of the full amount due to the Seller has been made and subject to Article G.14 hereof, the ***Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller***, ***and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel***, nor mix, blend, sell, encumber, pledge, alienate, or surrender the Bunkers to any third party or other Vessel.

*Id.* at ¶ H.2 (emphasis added).  However, the OW Bunker Group Terms do not define "Bailee."

Despite any arguments to the contrary, the Court finds that the Vessel is a bailee of OWB USA based on the plain language of the OW Bunker Group Terms.  Whether one applies English law, which governs the OW Bunker Group Terms, the definition contained in standard legal dictionaries, or the definition contained in the UCC, the meaning of "bailee" is consistent with its use in the OW Bunker Group Terms.

The United Kingdom Supply of Goods and Services Act defines "bailee" in relation to a relevant contract for the hire of goods as "(depending on the context) a person to whom the goods are bailed under the contract, or a person to whom they are to be so bailed, or a person to whom the rights under the contract of either of those persons have passed."  Supply of Goods and Services Act 1982, c. 29 Pt III § 18 (UK).  The English definition of "bailee" found in *A Dictionary of Law* directs the reader to "bailment," which provides:

> **bailment** *n.*  The transfer of the possession of goods by the owner (the **bailor)** to another (the **bailee)** for a particular purpose.  Examples of bailments are the hiring of goods, the loan of goods, the pledge of goods, and the delivery of goods for carriage, safe custody, or repair.  Ownership of the goods remains in the bailor, who has the right to demand their return or direct their disposal at the end of the period (if any) fixed for the bailment or (if no period is fixed) at will.  This right will, however, be qualified by any *lien the bailee may have over the goods.  Bailment exists independently of contract.  But if the bailor receives payment for the bailment (a **bailment for reward)** there is often an express contract setting out the rights and obligations of the parties.  A bailment for which the bailor receives no reward (e.g. the loan of a book to a friend) is called a gratuitous bailment.

*Bailment*, A DICTIONARY OF LAW (Jonathan Law ed., Oxford Univ. Press 9th ed. 2018).

Similarly, *Black's Law Dictionary* defines bailee as "1. Someone who receives personal property from another, and has possession of but not title to the property. . . . 2. Someone who by warehouse receipt, bill of lading, or other document of title acknowledges possession of goods and contracts to deliver them." *Bailee*, BLACK'S LAW DICTIONARY (11th ed. 2019). A bailment is "1. A delivery of personal property by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose, usu. under an express or implied-in-fact contract. Unlike a sale or gift of personal property, a bailment involves a change in possession but not in title." *Bailment*, BLACK'S LAW DICTIONARY (11th ed. 2019). "Bailee" is defined in the UCC as "a person that by a warehouse receipt, bill of lading, or other document of title acknowledges possession of goods and contracts to deliver them." UCC § 7-102(a)(1). Consistently, these definitions of "bailee" refer to a person who takes possession of goods while ownership and title remain with the bailor.

Both parties also rely on the United Kingdom Supreme Court case *PST Energy 7 Shipping LLC v OW Bunker Malta Ltd.*, [2016] 2 C.L.C. 1 (the "*Res Cogitans*" decision), in support of their respective positions. In *Res Cogitans*, the United Kingdom Supreme Court (the "UK Supreme Court"), held that the contract outlined in the OW Bunker Group Terms was one of sale under the Sale of Goods Act, finding that the vessel at issue could have "no possible defence" [sic] to the OW Bunker entity's claim for the price of the fuel purchased.[16] *Id.* at 18. The UK Supreme Court discussed in detail the bailment provision of the OW Bunker Group Terms in rendering its decision. In determining whether the agreement was a contract of sale,

---

[16] The *Res Cogitans* holding is consistent with the decisions in four courts of appeal in the United States that an OW Bunker Group entity, or its assignee, is the party entitled to a maritime lien over a Vessel, and a party such as Dolphin is not. *See, e.g.*, *Bunker Holdings Ltd. v. Yang Ming Liberia Corp.*, 16-35539 (9th Cir. Oct. 11, 2018); *Valero Marketing & Supply Co. v. M/V Almi Sun*, 893 F.3d 290 (5th Cir. 2018); *ING Bank N.V. v. M/V Temara*, 892 F.3d 511 (2d Cir. 2018); and *Barcliff, LLC v. M/V Deep Blue*, 876 F.3d 1063 (11th Cir. 2017).

the UK Supreme Court noted that paragraphs H.1 and H.2 of the OW Bunker Group Terms

demonstrate the contract's "special features": first, by

> expressly provid[ing] not only for the retention of title pending payment, but also expressly that, until such payment, the 'Buyer' is to be in possession of the bunkers '***solely as Bailee for the Seller***'.  After going on to provide that the Buyer 'shall not be entitled to use the bunkers', the terms introduce the qualification 'other than for the propulsion of the Vessel'.

*Id*. at 13-14 (emphasis added).  According to the UK Supreme Court,

> The qualification clearly reflects a reality.  Bunker suppliers know that bunkers are for use.  If they grant relatively long credit periods combined with a reservation of title pending payment in full, it is unsurprising that they do so combined with an express qualification authorising [sic] use in propulsion, since standard terms prohibiting any use would be uncommercial or in practice, no doubt, simply ignored.

*Id.* at 14.

The UK Supreme Court found that these features "together with an admissible modicum

of commercial awareness on the court's part about how ships operate . . . demonstrate that the

liberty to use the bunkers for propulsion prior to payment is a vital and essential feature of the

bunker supply business."  *Id.*  The contract between the OW Bunker Group entity and the

vessel's owner was therefore not a "straightforward agreement to transfer the property in the

bunkers to the Owners for a price," because it also permitted consumption of the bunkers "prior

to any payment and (once the theory of a nanosecond transfer of property is, rightly, rejected)

without any property ever passing in the bunkers consumed."  *Id.*  The OW Bunker Group

Terms' bailment structure was vital to the UK Supreme Court's analysis and, in the view of the

Court, cannot be disregarded.

The *Res Cogitans* decision and the virtually identical definitions of "bailee" from various

sources demonstrate that the use of the term "bailee" in the OW Bunker Group Terms fits

squarely within the common understanding of that word.  The Vessel, as *bailee*, takes possession

but not title to the bunker fuel, but is permitted to consume the fuel for the *sole* purpose of propulsion.  The *Res Cogitans* decision confirms that title to the bunker fuel does not transfer to the Vessel before payment, and because it is likely the fuel will be consumed before payment is made, transfer of title never occurs and the Vessel remains a "bailee."  *See Res Cogitans* at 14. The UK Supreme Court even hypothesized that if a circumstance arose where the bunker fuel had not been wholly consumed by the time payment was been made, only *then* would the title to the bunker fuel transfer to the vessel and the bailment would end.  *Id.*  Regardless of the issue of transfer of title, which does not bear on the meaning of "receipt" under section 503(b)(9), *see, e.g.*, *Marin*, 740 F.2d at 225, the Vessel is bailee of OWB USA.

OWB USA bought bunker fuel from Dolphin, and Dolphin delivered it to the Vessel. OWB USA was in constructive possession of the bunker fuel when the Vessel, as OWB USA's bailee, took physical possession of the bunker fuel.  Because the Vessel was permitted to use the bunker fuel for propulsion, which it did, Dolphin could not reclaim the bunker fuel.  No genuine issue of material fact exists as to whether OWB USA received the bunker fuel for purposes of section 503(b)(9).  Therefore, Dolphin is entitled, as a matter of law, to an allowed administrative expense claim for the value of the bunker fuel under the specific facts and circumstances of this case.  *See, e.g.*, 11 U.S.C § 546(c)(2); *Momenta II*, 2012 WL 3765171 at *4-5; *Momenta I*, 455 B.R. at 356.

## IV.    Conclusion

Having considered the Motions for Summary Judgment, the accompanying stipulations of fact, existing case law, and the record in this case, the Court holds that for the purposes of § 503(b)(9): (i) "received by the debtor" means actual or constructive possession of the goods, including physical possession of the goods by a bailee or agent of the debtor; (ii) the Vessel is

22

the bailee of OWB USA; and (iii) OWB USA was in constructive possession of the bunkers when they were delivered to the Vessel and therefore OWB USA "received" the bunkers. Accordingly, it is hereby

**ORDERED:** The Dolphin MSJ is **GRANTED** as to the issue of whether OWB USA "received the goods" pursuant to § 503(b)(9); and it is further

**ORDERED:** Dolphin is allowed an administrative expense claim in the amount of $82,165.30; and it is further

**ORDERED:** The OWB USA MSJ is **DENIED** as to the issue of whether OWB USA "received the goods" pursuant to § 503(b)(9).

Dated at Bridgeport, Connecticut this 19th day of August, 2019.

*Julie A. Manning*
Chief United States Bankruptcy Judge
District of Connecticut